Charles EVANS, et al., Petitioners,

v.

Thomas R. POLLOCK, et al.,
Respondents.

No. C–8949.

Supreme Court of Texas.

June 13, 1990.

Jim Arnold, Jr. and Mark L. Perlmutter, Austin, for petitioners.

Thomas H. Watkins, Elizabeth Bloch, Steve Selby, Christopher Fuller and Kirk Watson, Austin, for respondents.

## OPINION

RAY, Justice.

This is a restrictive covenant case involving the implied reciprocal negative easement doctrine. The trial court found that only the lakefront lots were impressed with restrictive covenants as part of the general plan of development, but the hilltop block was not. It implied the negative reciprocal easement on the developers' retained lakefront lots only, enjoining their use contrary to the restrictive covenants burdening the other lakefront lots. The court of appeals reversed and rendered, holding that a reciprocal negative easement can be imposed only when the general plan of development

includes the entire subdivision tract and attaches to all the property retained by the common developer-owner. 793 S.W.2d 14 (Tex.App.1989). We hold that there need only be a clearly-defined restricted district to which the restrictions apply as part of the plan of development, some lots of which are either retained by the owner-developer or sold to a purchaser with actual or constructive notice of the restrictions, for the doctrine to apply as to those lots. We reverse the judgment of the court of appeals and remand the cause to that court for consideration of factual sufficiency points.

## The Implied Reciprocal Negative Easement Doctrine

■ Because it sets the legal context for the factual disputes, we first briefly discuss the legal theory of this controversy. The doctrine of implied reciprocal negative easements applies when an owner of real property subdivides it into lots and sells a substantial number of those lots with restrictive covenants designed to further the owner's general plan or scheme of development. The central issue is usually the existence of a general plan of development. The lots retained by the owner, or lots sold by the owner from the development without express restrictions to a grantee with notice of the restrictions in the other deeds, are burdened with what is variously called an implied reciprocal negative easement, or an implied equitable servitude, or negative implied restrictive covenant, that they may not be used in violation of the restrictive covenants burdening the lots sold with the express restrictions. A reasonably accurate general statement of the doctrine has been given as follows:

[W]here a common grantor develops a tract of land for sale in lots and pursues a course of conduct which indicates that he intends to inaugurate a general scheme or plan of development for the benefit of himself and the purchasers of the various lots, and by numerous conveyances inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication an equitable right, variously referred to as an implied reciprocal negative easement or an equitable servitude, to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants. [Citations omitted.]

*Minner v. City of Lynchburg*, 204 Va. 180, 188, 129 S.E.2d 673, 679 (1963).

The implied reciprocal negative easement doctrine has long been recognized in many jurisdictions. Annot., 60 A.L.R. 1216 (1929); Annot., 144 A.L.R. 916 (1943). This court expressly approved the doctrine in *Curlee v. Walker*, 112 Tex. 40, 43–44, 244 S.W. 497, 498 (1922). *Curlee* was a standing case in which we expressly addressed whether the owner of a lot subject to a restrictive covenant had standing to assert the restrictive covenant in another landowner's deed; the case did not involve an implied reciprocal negative easement. Because the concept of a general plan of development is so frequently connected to the doctrine and standing questions, however, we wrote extensively on the implied reciprocal negative easement doctrine. The leading Texas case on implied reciprocal negative easements is *Hooper v. Lottman*, 171 S.W. 270 (Tex.Civ.App.—El Paso 1914, no writ), from which we quoted at length with approval in *Curlee*. We implicitly recognized the doctrine in *MacDonald v. Painter*, 441 S.W.2d 179 (Tex.1969). Numerous intermediate appellate decisions have applied it, as we will examine below.

## Facts

In September of 1947 Stanley and Sarah Agnes Hornsby (the Hornsbys), together with Charles and Bernice McCormick (McCormicks) platted a subdivision around Lake Travis from their commonly owned property in Travis County. They named the subdivision "Beby's Ranch Subdivision No. 1." The plat itself did not state any restrictions on land-use. The plat divided the property into seven blocks designated alphabetically "A" through "G". The plat did not further subdivide blocks C, D, E,

and F, but blocks A, B, and G were divided into thirty-one lots. The subdivision is on a peninsula-like tract that extends into the lake, so that much of it has lake frontage. All of the platted lots are lakefront lots. Block G is located on the point of the peninsula. Block F is located on a hill and is surrounded by lake-front lots. This is the schematic diagram of the subdivision:

Beby's Ranch
Subdivision No. 1.

Block F is also referred to as the "hilltop."

In October of 1947, before selling any lots other than two lots sold prior to the platting discussed below, the Hornsbys and McCormicks partitioned Beby's No. 1 between themselves. By partition deed the McCormicks received title to all of Blocks A, B, and C, and the Hornsbys got Blocks D, E, F, and G. Over the next several years, the Hornsbys and the McCormicks conveyed twenty-nine parcels of land from Beby's No. 1 to third parties or one another. Stanley Hornsby, a real estate attorney, and his law partner Louise Kirk, handled most of the legal work relating to the sale of lots, and the McCormicks made most of the sales. A real estate agent advertised some of the lakefront lots for sale in 1955, describing them as in "a restricted subdivision." Each deed from the Hornsbys and the McCormicks contained substantially the same restrictive covenants, including, among others, covenants: (1) prohibiting business or commercial use of the land conveyed; (2) restricting the land to residential use with only one dwelling per lot; and (3) providing that the restrictions could be changed by ¾ of the property owners within the subdivision "voting according to front footage holdings on the 715 contour line" of the lake. In 1946 the McCormicks had conveyed two of the lakefront lots unburdened by any deed restrictions. When the original grantee conveyed the two lots to third parties in 1954, he had Hornsby draft the deeds. The deeds contained the restrictions that the property could not be used for any business or commercial purposes and that the restrictions could be altered by the "¾ vote" along the 715 contour. Thus all lots conveyed ended up with substantially similar restrictions. All were lakefront lots, and voting rights under the restrictive covenants apparently were limited to lots with lake frontage.

The Hornsbys retained ownership of lots 4 through 8 in Block G and all of Block F. Both Hornsbys are now deceased, and the retained property passed to their devisees. The present dispute arose when the Hornsby devisees contracted to sell Thomas R. Pollock all of Block F and lots 4 and 5 in Block G for the purpose of building a marina, private club, and condominium development. Charles Evans and other owners whose deeds contained the restrictive covenants sued for equitable relief under the implied reciprocal negative easement doctrine. They sought declaration that the restrictive covenants enumerated above expressly imposed by deed upon their property were implied upon the Hornsby retained property. They further sought an injunction to prevent the Hornsby devisees from conveying the property without such deed restrictions.

*Trial Court Findings and Holding*

Trial was to the court. The testimony sharply conflicted as to Stanley Hornsby's oral representations of his intentions for the retained property. The evidence ranged from testimony that could reasonably be interpreted to mean that Hornsby intended all the subdivision property to be restricted, to testimony lending itself to the conclusion that Hornsby intended the retained property to be unrestricted in all respects. The trial court filed numerous findings of fact, including these:

17. The restrictions at issue were part of a general plan for development of the subdivision by the original subdividers, Stanley and Sarah Agnes Hornsby and Charles and Bernice McCormick.

18. This general plan of development involved protection/preservation of the strictly residential character of the subdivision, prohibition of business-commercial activities within the subdivision, and provision for change or modification of the restrictions by vote of the owners of parcels within the subdivision.

19. The general plan of development of the original subdividers (Stanley and Sarah Agnes Hornsby, Charles and Bernice McCormick) was that all lakefront property within the subdivision be burdened with the same restrictions.

20. Stanley Hornsby and his real estate broker represented to various purchasers that all lakefront parcels (i.e. all parcels except Block F) were restricted to resi-

dential use only and that business-commercial use thereof was prohibited.

\* \* \* \* \* \*

22. Non-enforcement of the general plan of development as to the lakefront lots will decrease the value of the lots purchased and presently owned by Plaintiffs Arnold and Kay Sousares.

The trial court rendered judgment declaring that the restrictions at issue applied to the five lakefront lots owned by the Hornsby devisees and enjoining them from conveying any interest in the lots without including the restrictions in the conveyance.

### Court of Appeals Action and Holding

All parties appealed the judgment. The Hornsby devisees and Pollock interests maintained that the restrictions should not have been implied on the retained property, and the Evanses and other property owners complained that the trial court should have also implied the restrictions against the hilltop and should have allowed them attorneys' fees. The court of appeals reversed and rendered judgment that plaintiffs take nothing, holding that none of the retained lots were restricted. The court of appeals reasoned that for the implied reciprocal negative easement doctrine to apply, the original grantors had to have intended that the entire subdivision be similarly restricted. Relying primarily on the language from *Saccomanno v. Farb*, 492 S.W.2d 709, 713 (Tex.Civ.App.—Waco 1973, writ ref'd n.r.e.), requiring proof "evidencing a scheme or intention that the entire tract should be similarly treated," the court wrote, "It is the scope of the plan which defeats application of the doctrine." 793 S.W.2d at 21.

### No Requirement of "Inception" of Plan

■ Respondents urge that the court of appeals' holding should be construed to be that there was no evidence that the developer-grantors intended *from the inception of the subdivision* that there would be specific restrictions that applied to *all* property within the subdivision. Respondents cite *Davis v. Huey*, 620 S.W.2d 561, 567 (Tex.1981), for the proposition that the gen-

eral scheme or plan must exist when the subdivision is platted, or from the inception of the subdivision. We stated in *Davis v. Huey*, "Moreover, the meaning of Paragraph 8 and accordingly the nature of the notice thereby furnished to the Davises, is determined at the date of the inception of the general plan or scheme, i.e., in 1965, the date of filing of the restrictions in the Deed Records of Travis County." This statement should not be read out of the context of the case. *Davis v. Huey* involved express restrictive covenants recorded on the plat for an entire subdivision. There was an express setback requirement, and an architectural approval requirement ("Paragraph 8"). The developer had used the architectural approval requirement to impose an additional setback requirement (by denying approval) because other lot owners had actually built their houses further from the lot lines. The developer sought to enforce a setback uniformity beyond what existed when the Davises bought their lot, and admittedly beyond the types of architectural restrictions envisioned by the original plan of development. *Davis v. Huey* was a "notice" case. We wrote it was "essential that the party seeking to enforce the restrictions on the use of land establish that the purchaser had notice of the limitations on his title." 620 S.W.2d at 567. The requirement that the general plan exist from the inception of the subdivision applied only in the factual context of that notice case. In particular, we attach no significance to the fact that two lots were sold without restrictions before the owners formulated their general scheme or plan of development.

### The Scope of a "Restricted District"

■ Provisions in restrictive covenants that the restrictions may be waived or modified by the consent of three-fourths of the lot owners constitute strong evidence that there is a general scheme or plan of development furthered by the restrictive covenants. *Armstrong v. Leverone*, 105 Conn. 464, 472, 136 A. 71, 74 (1927). The voting rights in the present case clearly attached only to lakefront lots. It was reasonable

for the trial court to conclude that the restrictions were meant to apply only to the lakefront lots. The legal question is whether all the tracts in the development must be intended to be subject to the restrictions for the implied reciprocal negative easement doctrine to apply to any of the retained lots. We find it immaterial whether the question is phrased as whether the plan may be that some tracts are unrestricted while others are restricted, or whether the plan need only apply to certain similarly situated lots. We hold that the general plan or scheme may be that the restrictions only apply to certain well-defined similarly situated lots for the doctrine of implied reciprocal negative easements to apply as to such lots. Logical extensions of Texas decisions, as well as decisions from sister states, support our conclusion.

Texas cases support the conclusion that the restricted area need not be the whole subdivision. The facts in *Curlee v. Walker* were that after the creation of the Floral Heights Addition in the City of Wichita Falls, the developers set aside 18 blocks to be subject to restrictive covenants for ten years from date of purchase, that the land would be used for residential purposes only, that there would be one residence to two whole lots, and that the cost to construct the residence would be at least $3,000. This court in its opinion referred to the 18 blocks as the "restricted district" and referred to the plan as "[t]his general scheme or plan of creating a restricted residence district." 112 Tex. at 42, 244 S.W. at 497. Thus a general scheme or plan need not apply to the whole tract or subdivision. In *Hooper v. Lottman*, from which we quoted with approval, the restriction had been that no barns would be constructed within 60 feet of a specific street. The number of feet varied in each deed, so there was no absolute uniformity, but the "restricted district" to which the plan applied was obviously lots with frontage on that street. Similarly, in upholding the trial court's refusal to enforce restrictive covenants on other grounds, in *Canyon v. Ferguson*, 190 S.W.2d 831, 834 (Tex.Civ. App.—Fort Worth 1945, no writ), the appellate court wrote it was "not essential that

there be a general scheme of restricting all of the lots in the additions. Valid restrictions could result from a scheme to restrict the lots in only one block, or those facing on only one street."

Likewise, in *Crump v. Perryman*, 193 S.W.2d 233, 235 (Tex.Civ.App.—Dallas 1946, no writ), the court wrote, "[W]e know of no rule of law requiring the particular improvement district to embrace an addition in its entirety," citing *Curlee*. Similar statements concerning the extent of the "restricted area" appear in *Lehmann v. Wallace*, 510 S.W.2d 675, 681 (Tex.Civ.App. —San Antonio 1974, writ ref'd n.r.e.), and *Cambridge Shores Homeowners Ass'n v. Spring Valley Lodge Co.*, 422 S.W.2d 10, 14 (Tex.Civ.App.—Dallas 1967, no writ). Finally, in a case tried on the implied reciprocal negative easement theory, we expressly approved an opinion that found no error in the jury instruction requiring that the restrictions be "substantially uniform, and that they be imposed on substantially all the lots *in the restricted area.*" *Bethea v. Lockhart*, 127 S.W.2d 1029, 1032 (Tex.Civ.App.—San Antonio 1939, writ ref'd)(emphasis added).

The language from the Texas cases suggesting that the restricted district need not be the whole subdivision is in agreement with decisions from other states. In *First Security National Bank & Trust Co. v. Peter*, 456 S.W.2d 46 (Ky.Ct.App.1970), the court found a restricted district comprising less than the whole subdivision including most lots that faced a particular street. Even more in point is the Kentucky case of *Bellemeade Co. v. Priddle*, 503 S.W.2d 734 (Ky.Ct.App.1974). There the owners had platted and recorded sections I, II, III, IV and V of the Bellemeade subdivision. Sections I, II, III and IV had been marketed as restricted to one-family residential uses, but section V was a tract of approximately 12 acres adjacent to a major United States highway, different in character from the other sections. When the plat of section I went to record, there was a contract with the real estate firm marketing the subdivision which gave it the exclusive right to sell residential lots, but there was a sepa-

rate provision giving those agents the exclusive right to sell, lease or develop section V as multi-family duplex housing, a shopping center and parking area. There was evidence of negotiations about section V with prospective buyers or developers for commercial enterprises both before and after the platting of the subdivision. After reviewing the marketing evidence, the court concluded there was no evidence that any lots in section V were offered for sale for residential purposes or evidence of confusion as to the developers' intent.[1] The court held that the implied reciprocal negative easement doctrine applied as to retained lots in sections I through IV, but that section V was not part of the restricted area and could be sold for construction of a proposed Holiday Inn motel.

In *Weber v. Les Petite Acadamies, Inc.*, 490 S.W.2d 278 (Mo.App.1973), the original grantor had platted a subdivision composed of Lot A, Lot B, and a large number of numbered lots. All numbered lots sold were conveyed with deeds restricting them to residential purposes. It was conceded there was a common plan or scheme of development, but the owner contended Lots A and B were not part of the restricted area. On summary judgment evidence that the common grantor did not intend Lots A and B to be restricted to residential dwellings and that the character of Lots A and B was totally different from that of the rest of the lots in the subdivision in that Lots A and B were larger, abutted on a busy traffic artery, and were lettered on the plat rather than numbered, the appellate court held that summary judgment was improper because substantial factual questions were raised whether Lots A and B were part of the restricted area. Likewise, in *Sharts v. Walters*, 107 N.M. 414, 759 P.2d 201 (N.M.App.1988), the owner had platted a Tract A consisting of a 60–acre tract and a Tract B consisting of a 15.044 acre tract. All lots in Tract A (ex-

cept for two acres where there was a pre-existing restaurant) had been sold with residential restrictions. The appellate court upheld the trial court finding that Tract B was not burdened by implied reciprocal restrictions, holding that whether Tract B was part of the restricted area under the plan of development was a fact question of what was intended to be covered by the restrictions. The New Mexico court cited the Texas *Lehmann v. Wallace* case, which we discussed above. Finally, by way of further example, in *Duvall v. Ford Leasing Development Corp.*, 220 Va. 36, 255 S.E.2d 470 (1979), the court held that when a larger tract is subdivided into sections and lots in stages, for purposes of the implied reciprocal negative easement doctrine, each separate recording created a separate and distinct subdivision with its own set of restrictions benefiting and burdening only the land in that particular subdivision.[2] We have concluded that the weight of authority supports our conclusion that the restricted district need not be the whole subdivision nor include the whole retained tract.

We have reviewed the record and find there is some evidence to support all trial court findings that were attacked in the court of appeals. Because there were factual sufficiency points raised in the court of appeals upon which that court has not ruled, we remand this cause to the court of appeals for further consideration consistent with this opinion.

GONZALEZ, J., notes his dissent. (Opinion to follow).

DOGGETT, J., not sitting.

GONZALEZ, Justice, dissenting.

For the reasons stated in the court of appeals opinion, I dissent.

---

1. Our discussion of this case in the restrictive covenant context should not be taken as an indication that under Texas law the same evidence would not support a finding of confusing or misleading acts or practices by those marketing the lots.

2. For another case following the *Duvall* rationale that each stage of development is a separate and distinct subdivision with its own set of restrictions, see *Bernui v. Tantallon Control Committee,* 62 Md.App. 9, 488 A.2d 186 (1985).