**H.H. HOLLOWAY TRUST, Appellant,**

v.

**OUTPOST ESTATES CIVIC CLUB INCORPORATED, Appellee.**

No. 01–02–00184–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 8, 2004.

Rehearing Overruled May 6, 2004.

Clayton C. Cannon, Stumpf Falgout Craddock Massey, Peter M. Kelly, Hogan & Hogan, L.L.P., Houston, TX, for Appellant.

John Bradley Mitchell, Stephanie L. Quade, Marc D. Markel, Roberts, Markel, & Guerry, P.C., Houston, TX, for Appellee.

Panel consists of Justices TAFT, NUCHIA, and KEYES.

## OPINION

SAM NUCHIA Justice.

This is an appeal of a judgment declaring that the deed restrictions for Outpost Estates Section One apply to Lots 52 and 53 of that subdivision. We affirm.

## BACKGROUND

On April 10, 1951, L.D. and Ada Chachere conveyed a 43–acre tract of land fronting on Clay Road in Harris County to M.F. James, J.A. Hamilton, and W.E. Little (the developers). The warranty deed provided for payment in installments, and the Chacheres retained a vendor's lien on the property. On May 7, 1951, the developers and the Chacheres signed a plat of a 53–acre subdivision, which included the 43–acre tract, named Outpost Estates Section One. According to the plat, the property was subdivided into 52 lots, numbered 1 through 50, 52, and 53.[1] The plat also showed streets, building set-back lines, and utility easements. The plat and subdivision were approved by the City Planning Commission of the City of Houston on May 10, 1951.

On August 1, 1951, the Chacheres deeded Lots 52 and 53 of Outpost Estates to their daughter, Margaret Chachere Vilven,

as her separate property in consideration of the love and affection they bore her. Following the description of the lots, the deed stated,

SAID LOT IS RESTRICTED IN ITS USE, AND THE RESTRICTIONS Said [Sic] ARE FILED WITH THE COUNTY CLERK OF HARRIS COUNTY UNDER FILE NO._____ IN VOL.\_\_\_\_ PAGE\_\_

Vilven testified by deposition that she knew at the time she was given the lots that they were restricted to residential use.[2]

On August 14, 1951, the developers and the Chacheres executed a declaration of restrictive covenants for Outpost Estates "to establish and maintain a general plan for the use of the property . . . as private residential lots." The restrictions provide, "No lot shall be used except for residential purposes." They also recite "that the said J.A. Hamilton, M.F. James and W.E. Little are the sole owners of said property and the said L.D. Chachere and wife, Ada Chubb Chachere, join herein as the owners of the vendor's lien retained in said deed above mentioned, and that said parties together represent the entire interest in said property." The restrictions recite that the plat of the subdivision was filed in the office of the County Clerk on August 14, 1951. The plat was recorded on September 25. The deed restrictions were filed on September 17 and recorded on October 31, and the deed from the Chacheres to Vilven was filed on September 21 and recorded on November 8.[3] Vilven sold her

---

**1.** There is no explanation for the missing lot number 51 other than the statement by W.E. Little during his deposition that he did not know why the lots were numbered as they were and that "Roy (Pitner, the engineer who platted the tract) was a most unusual man."

**2.** Lot 52 was on the corner of Clay Road and Frontier Drive. Lot 53 was adjacent to Lot 52, facing Frontier Drive. The Chacheres deeded Lots 12 and 13, which were directly

across Frontier Drive from Lots 52 and 53, to their son, inserting the same restriction paragraph as that in the deed to Vilven. The status of Lots 12 and 13 is not an issue in this case.

**3.** In 1951, because documents were recorded by hand, there was often a considerable period of time between the date on which a docu-

two lots in 1953, and there were other owners before it was bought by H.H. Holloway. It is undisputed that the deeds conveying Lots 52 and 53 do not specifically reference the deed restrictions.

In 1988, Doris Holloway, as executor of the estate of H.H. Holloway, conveyed Lots 52 and 53 to the H.H. Holloway Trust (the Trust). In 1998, the trustee, H.H. Holloway Jr., informed Ed Fritcher, a member of the architectural committee, that he wanted to develop the two lots for commercial purposes. Fritcher told Holloway that the subdivision was restricted and that businesses were not allowed. The Trust filed an action for a judgment declaring that Lots 52 and 53 do not fall within and are not restricted by the deed restrictions of Outpost Estates Section One. After a bench trial, the trial court rendered judgment that the deed restrictions apply to the lots.

## DISCUSSION

On appeal, the Trust contends that the trial court erred in determining that Lots 52 and 53 are subject to the deed restrictions because the deed restrictions are limited so as to exclude the lots, the deed conveying Lots 52 and 53 does not specify where the restrictions are recorded, and the doctrine of implied reciprocal negative easement cannot apply in the absence of a common grantor. In addition, the Trust asserts that the trial court erred in admitting parol evidence to establish the developers' intent and that the record is legally and factually insufficient to support three of the trial court's findings of fact.

### Standard of Review

■■■■ The appellant must challenge the sufficiency of the trial court's findings in its issues on appeal or the findings are binding on the appellate court. *IKB Indus. (Nigeria) Ltd. v. Pro–Line Corp.,* 938

S.W.2d 440, 445 (Tex.1997). If the appellant challenges the findings in its issues, the appellate court will review the legal and factual sufficiency of the evidence to support the findings in the same manner it reviews a jury's findings in a jury trial. *Escobar v. Escobar,* 728 S.W.2d 474, 475 (Tex.App.-San Antonio 1987, no writ); *State Bar of Texas v. Roberts,* 723 S.W.2d 233, 235 (Tex.App.-Houston [1st Dist.] 1986, no writ). In reviewing the legal sufficiency of the evidence, the court can consider only the evidence and inferences that tend to support the finding, and must disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). In reviewing the factual sufficiency of the evidence, the court must consider all evidence in the record, both in support of, and contrary to, the finding. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986).

### Legal and Factual Sufficiency of Evidence to Support Findings

In its sixth issue, the Trust challenges three of the trial court's findings of fact. First, the Trust complains that, in finding of fact number one, the trial court found that Chacheres conveyed 53 acres when only 43 acres were conveyed.

The Trust is correct regarding the number of acres, but the trust has neither argued nor shown how this is reversible error. The additional 10 acres included in the plat of Outpost Estates Section One were evidently owned by the Chacheres, who joined with the developers in the creation of the subdivision. We conclude that the trial court's error in stating the number of acres conveyed by Chacheres to the developers is harmless.

Second, the Trust complains that, in conclusion of law number 19, which is actually a fact finding, the trial court found, "The

ment was filed and the date on which it was    recorded.

Chacheres were a common owner of related parcels of land." The Trust argues that, because the 43–acre tract was not subdivided until after the tract was conveyed to the developers, the Chacheres were never the common owner of related parcels of land.

The Chacheres and the developers joined together to subdivide a tract of land, part of which belonged to the developers and part of which belonged to the Chacheres. Therefore, there is evidence to support the trial court's finding that the Chacheres were common owners of related parcels of land.

Finally, the Trust complains that, in conclusion of law number 28, which is also a fact finding, the trial court found, "The general plan for Outpost Estates, Section One did exist prior to conveyance of Lots 52 and 53 from the Chacheres to Margaret Chachere Vilven, and was evidenced in the deed conveying such title."

The general plan for the subdivision was signed by the Chacheres and the developers on May 7, 1950, nearly three months before the Chacheres deeded Lots 52 and 53 to Vilven. The description of the property in the deed, "LOTS FIFTY–TWO (52), AND FIFTY–THREE (53) IN BLOCK 'F' OF OUTPOST ESTATES ADDITION," is evidence that the general plan for the subdivision existed prior to the conveyance. The general plan was further evidenced by the incomplete reference to the filed restrictions.

The evidence is legally and factually sufficient to support the challenged findings of fact regarding common ownership and a general plan. The trial court's error in finding that 53 acres were conveyed to the developers is harmless. We overrule the Trust's sixth issue.

### Parol Evidence of Intent

In its fifth issue, the Trust complains that the trial court erred in admitting evidence of the developers' intent because the deed restrictions "unambiguously exclude Lots 52 and 53 from their scope."

■ The Trust's argument is without merit. The parol evidence was not admitted for the purpose of interpreting the document itself, but to determine the applicability of the document to lots within the general plan but outside the scope of the document. In determining the application of the doctrine of implied reciprocal negative easements, courts may look to the intent of the developer. *See Lehmann v. Wallace,* 510 S.W.2d 675, 680 (Tex.Civ. App.-San Antonio 1974, writ ref'd n.r.e.) (stating that most common test of existence of general scheme is intent that protection of restrictive covenant inure to benefit of purchasers of lots).

We overrule the Trust's fifth issue.

### The Vilven Deed

■ In its third issue, the Trust contends that Lots 52 and 53 cannot be bound by the deed restrictions because the deed conveying the lots from the Chacheres to Vilven did not specify where the filed deed restrictions were recorded. The Trust argues that the reference to restrictions in Vilven's deed is a general statement of restriction designed to protect a grantor, citing *Sills v. Excel Servs., Inc.,* 617 S.W.2d 280 (Tex.Civ.App.-Tyler 1981, no writ).

In *Sills,* the deed at issue stated that the property was "Subject to all reservations, restrictions and easements of record or apparent from visual inspection." *Id.* at 284. However, the property conveyed by the deed was not within the platted subdivision; therefore, the restrictions of the subdivision did not apply. *Id.*

In the present case, the reference to restrictions is not such a general statement. It is a specific statement inserted by the grantor: "Said lot is restricted in its use . . . ." But the reference to the location of the recorded restrictions is incom-

plete. Nevertheless, the statement of restrictions is sufficient to put a subsequent purchaser on notice that there are use restrictions that apply to the property. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex.1982) ("[A] purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims," citing *Wessels v. Rio Bravo Oil Co.*, 250 S.W.2d 668 (Tex.Civ. App.-Eastland 1952, writ ref'd)); *Selected Lands Corp. v. Speich*, 702 S.W.2d 197, 200 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.) (stating that general plan of development that is maintained, relied upon, and acted upon is binding on grantee of lot not specifically restricted if grantee took with notice of restriction or knowledge of general plan).

We conclude that the incomplete reference to the filed deed restrictions does not defeat their applicability to Lots 52 and 53. We overrule the Trust's third issue.

### Implied Reciprocal Negative Easement

The trial court's Conclusion of Law number 21 stated,

> The doctrine of reciprocal negative easement applies to Outpost Estates, Section One, in that the subdivision is encumbered by recorded instruments evidencing the scheme or intent that Lots 52 & 53 should be treated similar to the other lots in Section One.

In its first and fourth issues, the Trust contends that the trial court erred in determining that Lots 52 and 53 are subject to the deed restrictions for Outpost Estates Section One under the doctrine of implied reciprocal negative easement because the ownership of the lots was not derived from a common grantor, which is required to trigger the doctrine. The Trust reasons that, at the time the restrictions were signed, Lots 52 and 53 were owned by Vilven, and it implies that the remaining portion of the subdivision was owned by the developers; therefore, according to the Trust, there was no common grantor of the entire subdivision.

The doctrine of implied reciprocal negative easements applies when an owner of real property subdivides the property into lots and sells a substantial number of those lots with restrictive covenants designed to further the owner's general plan or scheme of development. *Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990). When the owner of a tract of land subdivides it into lots according to a general scheme or plan, and sells those lots by deeds containing substantially uniform restrictions, the grantees acquire by implication an equitable right to enforce similar restrictions against any lots retained by the grantor or sold by the grantor without such restrictions to a purchaser with actual or constructive notice of the restrictions. *Id.* (citing *Minner v. City of Lynchburg*, 204 Va. 180, 129 S.E.2d 673, 679 (1963)). This implied right is variously called an implied reciprocal negative easement or an implied equitable servitude. *Id.*[4]

4. The Trust contends that appellee asserts the doctrine of equitable servitude for the first time on appeal. The Trust argues that the doctrine of equitable servitude is separate and discrete from the doctrine of implied reciprocal negative easement as a means of creating restrictions that attach to a particular property, citing this Court's opinion in *Selected Lands Corp. v. Speich*, 702 S.W.2d 197, 198 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). In *Speich*, we indicated that restrictive covenants could be created in four ways, including by implied reciprocal negative easement and by equitable servitude through a general plan of development. *See id.* The Texas Supreme Court has since clarified that implied reciprocal negative easement, equitable servitude, and negative implied restrictive covenant are alternative names for the same doctrine. *Evans v. Pollock*, 796 S.W.2d 465, 468 (Tex.1990).

In this case, the Chacheres and the developers joined together to sign and file the plat of Outpost Estates Section One. The platted tract included the 43 acres conveyed by the Chacheres to the developers and an additional 10 acres. That the Chacheres gave two of the platted lots to Vilven and two to their son is some evidence that the Chacheres retained some of the platted tract. There is nothing in the record to show that the additional acreage was owned by anyone other than the Chacheres. Therefore, we conclude that the Chacheres and the developers, together, were common grantors of the related parcels of land.

In addition, there is evidence that the owners of the lots had actual or constructive notice of the deed restrictions. Vilven, a donee rather than a purchaser, testified that she knew when she was deeded the lots that they were subject to deed restrictions and that they were to be used only for residential purposes. As discussed above, the deed from the Chacheres to Vilven gave some notice that the lots were restricted in their use.

Accordingly, the trial court did not err in concluding that the deed restrictions apply to Lots 52 and 53 by implication. We overrule the Trust's first and fourth issues.

## CONCLUSION

Having concluded that Lots 52 and 53 are subject to an implied reciprocal negative easement, we need not reach the Trust's second issue regarding the express limitations within the deed restrictions.

We affirm the judgment.