OPINION









 



                                                                                                                                                            

                                                                                                                       

 

 

 

 

OPINION

 

No. 04-07-00721-CV

 

SKI MASTERS OF TEXAS, LLC and Don Ennis,

Appellants

 

v.

 

Ronald HEINEMEYER,
Karen Heinemeyer, Arthur Creager, Patsy Jean Creager, 

Thomas Price, Sheryl
Price, George Stone and Sandra Stone,

Appellees

 

From the 25th Judicial
District Court, Guadalupe County, Texas

Trial Court No. 04-1945-CV

Honorable Gary L.
Steel, Judge Presiding

 

Opinion by:     Rebecca Simmons, Justice

 

Sitting:            Alma L. López,
Chief Justice

                        Phylis J. Speedlin, Justice

                        Rebecca Simmons, Justice

 

Delivered and
Filed:   August 29, 2008

 

AFFIRMED

 

This restrictive covenant case arises from the purchase of a parcel of
property in an area referred to as the Carlson Subdivision by Appellant Ski
Masters of Texas, LLC, owned by Appellant Don Ennis (Ski Masters and Ennis are
referred to collectively as “Ski Masters”).  Appellees Ronald Heinemeyer, Karen
Heinemeyer, Arthur Craeger, Patsy Jean Craeger, Thomas Price, Sheryl Price,
George Stone, & Sandra Stone (collectively, the “Residents”) own property
in the Carlson Subdivision.  The Residents sued Ski Masters to enforce
residential-only use restrictions.  After a bench trial, the trial court
entered judgment for the Residents.  We affirm the judgment of the trial court.

Background

            In
1956, Milton and Evelyn Carlson (collectively, “Carlson”) platted and
subdivided a 6.76 acre property into ten tracts of land of varying acreages. 
The plat was not recorded.  Between 1957 and 1972, Carlson sold the ten tracts
of land to various people.

The first of these deeds conveyed what the parties call “tract 7” from
Carlson to Kenneth Fleming (the “Fleming Deed”).  This deed, which was recorded
in volume 311, page 208 of the real property records of Guadalupe County, contained the following provisions (emphasis added):

This conveyance is made subject to the following conditions and
restrictions:

a.                  
Said premises shall be used for residential purposes only and no
business of any nature shall be conducted thereon. . . . 

. . . .

 

The above
conditions and restrictions shall be covenants running with the land, and shall
be enforceable by injunction, suit for damages or other appropriate remedy at
the election of the person or persons entitled to enforce same, and shall be
binding on the grantees herein, their heirs and assigns for a period of 25
years from this date after which time said covenants shall be automatically
extended for successive periods of 10 years each unless an instrument signed by
a majority of the then owners of any portion of the hereinbefore mentioned 6.76
acres of land, known as the Carlson tract, has been recorded whereby such
owners agree to change said conditions and restrictions in whole or in part.

 

. . . .

 

Grantor
also, by this instrument subjects the remainder of the 6.76 acres of land with these
same restrictions, conditions and options, whether embodied in future
instruments of conveyance or not.

 

The deeds by
which Carlson conveyed seven of the remaining nine original tracts reference
and incorporate the restrictions contained in the Fleming Deed.  Although the
incorporating language is not identical, each of the seven deeds reference the
volume and page number of the Fleming Deed and contain language similar to the
following:  “It is expressly understood that this conveyance is subject to the
same restrictions, conditions, options and exceptions set out and recorded in
Volume 311, Page 208 of the Guadalupe County deed records [i.e., the Fleming
Deed].”  Carlson did not include such language in the deeds conveying tracts 2
and 4.

In June 2004, Ski Masters purchased property including portions of tracts
4 and 5, as well as a very small amount of adjacent land that was not included
in the original 6.76 acre tract.  The deed by which Ski Masters purchased this
property states that the conveyance is subject to the restrictive covenants set
out in the Fleming Deed.  Moreover, Ennis and his realtor were aware of the
deed restrictions at the time of purchase.

The Residents and Ski Masters each filed suit against one another, and
the suits were consolidated.  The Residents sought to enforce the
residential-only restrictions against Ski Masters’ proposed use of its
property.  Ski Masters sought a declaration that the property was not subject
to any valid restrictions enforceable by the Residents.  The trial court
granted a temporary injunction enjoining Ski Masters from constructing a ski
school or engaging in any activity violating the alleged residential-only
restriction.  All parties filed motions for summary judgment, which the trial
court denied.

The case was set for a bench trial and at the time of trial, the parties
agreed that the trial court should decide the case on the evidence and
pleadings already in the record, including the summary judgment evidence filed
by both parties and the transcript of the temporary injunction hearing.  The
trial court signed a final judgment for the Residents and subsequently entered
findings of fact and conclusions of law.  These findings and conclusions
reflect the trial court’s determination that the Ski Masters property was
subject to an express residential-only restriction, and alternatively was
burdened by an implied reciprocal negative easement precluding use of the
property for business activities.  The trial court also awarded the Residents
trial and appellate attorneys’ fees.  Ski Masters appeals.

Standard of Review

The trial court’s findings of fact have the same force and dignity as a
jury’s verdict and are reviewable for legal and factual sufficiency under the
same standards as applied to the reviewing of a jury verdict.  Anderson
v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991).  Findings that
are supported by competent evidence are ordinarily binding on an appellate
court.  Reyes-Retana v. PTX Food Corp., 709 S.W.2d 695, 697 (Tex. App.—San Antonio 1986, writ ref’d n.r.e.).  A trial court’s conclusions of law are
reviewed de novo.  BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d
789, 794 (Tex. 2002).  If a conclusion of law is erroneous, but the judgment is
still proper, the erroneous conclusion does not require reversal.  Id.  Likewise, no reversal is warranted if “controlling findings of fact will
support the judgment under a correct legal theory.”  Lifshutz v. Lifshutz,
199 S.W.3d 9, 17 (Tex. App.—San Antonio 2006, pet. denied).

When construing a restrictive covenant, appellate courts apply general
rules of contract construction.  Pilarcik v. Emmons, 966 S.W.2d 474, 478
(Tex. 1998).  Covenants are examined as a whole in light of the circumstances
present when the parties entered into the agreement.  Id.  The reviewing
court’s primary intent is to ascertain and give effect to the true intention of
the parties as expressed in the instruments.  Owens v. Ousey, 241 S.W.3d
124, 129 (Tex. App.—Austin 2007, pet. denied).  A trial court’s construction of
a restrictive covenant is reviewed de novo.  Id.

Ski Masters challenges the Residents’ standing to enforce a restrictive
covenant.  Standing is a legal question reviewed de novo.  Myer
v. Cuevas, 119 S.W.3d 830, 833 (Tex. App.—San
Antonio 2003, no pet.).  The test for standing is whether there is “(1)
a real controversy between the parties (2) that will be actually determined by
the judicial declaration sought.”  Antonov v. Walters, 168 S.W.3d 901,
904 (Tex. App.—Fort Worth 2005, pet. denied).  Ordinarily, any person entitled
to benefit under a restrictive covenant is entitled to enforce it.  Anderson v. New Prop. Owners’ Ass’n of Newport, Inc., 122 S.W.3d 378, 384 (Tex. App.—Texarkana 2003, pet. denied).  Where many property owners are interested in a
restrictive covenant, any one of them can enforce it.  Giles v. Cardenas, 697 S.W.2d 422, 427 (Tex. App.—San Antonio 1985, writ ref’d n.r.e.).

Analysis

            On
appeal, Ski Masters challenges the Residents’ standing to enforce a restrictive
covenant, the existence of a valid express restrictive covenant, application of
the doctrine of implied reciprocal negative easement to imply such a covenant, and
the attorneys’ fees award.

            The
initial conveyance of tract 4 by Carlson contained no restrictions.  However, the
deed by which Ski Masters obtained its tract identifies “exceptions to
conveyance” that include “[r]estrictive covenants as set out in instrument
recorded in Volume 311, Page 208, of the Deed Records of Guadalupe County,
Texas [i.e., the Fleming Deed] . . . .”  Thus, the issue is not whether Ski
Masters’ tract is subject to the restrictions imposed in the Fleming Deed – it
unquestionably is.  The issue is whether the Residents, all of whom are outside
the tract’s chain of title, have standing to enforce those restrictions against
Ski Masters.

A.        General
Principles Stated

            1.         General
Scheme or Plan of Development

            A
restrictive covenant is a contractual agreement between the seller and the
purchaser of real property.  In ordinary circumstances, a restrictive covenant
is enforceable only by the contracting parties and those in direct privity of
estate with the contracting parties.  See, e.g., Davis v.
Skipper, 125 Tex. 364, 83 S.W.2d 318, 321-22 (1935); Wayne Harwell
Props. v. Pan Am. Logistics Ctr., Inc., 945 S.W.2d 216, 218 (Tex. App.—San
Antonio 1997, writ denied).  Circumstances do exist, however, in which a
restrictive covenant may be enforced by someone other than the grantor or
grantee.  For example, a property owner may subdivide property into lots and
create a subdivision in which all property owners agree to the same or similar
restrictive covenants designed to further the owner’s general plan or scheme of
development.  Under these circumstances, each purchaser within the subdivision
is assumed to benefit from the restrictions and each has the right to enforce
the restrictions. See, e.g., Curlee v. Walker, 112 Tex. 40, 
244 S.W. 497, 498 (1922) (“It is perfectly clear that it is lawful for
districts with restrictions [designed to benefit all property owners] to be
created, and also that each purchaser has the right to rely on and to enforce
those restrictions.”).

Hooper v. Lottman, 171 S.W. 270 (Tex. Civ. App.—El Paso 1914, no
writ), is the seminal case regarding the “controlling general principles of the
law” in this area, and is worthy of extensive quotation: 

[T]he general
rule may be safely stated to be that where there is a general plan or scheme
adopted by the owner of a tract, for the development and improvement of the
property by which it is divided into streets and lots, and which contemplates a
restriction as to the uses to which lots may be put, or the character and
location of improvements thereon, to be secured by a covenant embodying the
restriction to be inserted in the deeds to purchasers, and it appears from the
language of the deed itself, construed in the light of the surrounding
circumstances, that such covenants are intended for the benefit of all the
lands, and that each purchaser is to be subject thereto, and to have the
benefit thereof, and such covenants are inserted in all the deeds for lots sold
in pursuance of the plan, a purchaser and his assigns may enforce the covenant
against any other purchaser, and his assigns, if he has bought with actual or
constructive knowledge of the scheme, and the covenant was part of the
subject-matter of his purchase.

 

Id. at
272; see Evans v. Pollock, 796 S.W.2d 465, 466 (Tex. 1990) (describing Hooper
as “[t]he leading Texas case” in this area); Curlee, 112 Tex. 40, 244
S.W. at 498 (quoting Hooper at length after declaring that “[t]he
correct rules that govern covenants of the character set out in the deeds to
this restricted district are well stated . . . in [Hooper]”).  In other
words, where an owner of a tract subdivides and sells the subdivided parcels to
separate grantees, imposing restrictions on the use of each parcel pursuant to
a general plan or scheme of development, each grantee may enforce the
restrictions against each other grantee.  Lehmann v. Wallace, 510 S.W.2d
675, 
680-81 (Tex. Civ. App.—San Antonio 1974, writ ref’d n.r.e.).

            2.         Standing

            Questions
about standing are implicated whenever a property owner seeks to enforce such a
restrictive covenant.  Standing essentially depends on two things:  (1) the
existence of a general plan or scheme of development (2) that was part of the
inducement for purchasers to obtain land within the restricted area:

The most
familiar cases in which courts of equity have upheld the right of owners of
land to enforce covenants to which they were not parties are those in which it
has appeared that a general building scheme or plan for the development of a
tract of land has been adopted, designed to make it more attractive for
residential purposes by reason of certain restrictions to be imposed on each of
the separate lots sold. This forms an inducement to each purchaser to buy, and
it may be assumed that he pays an enhanced price for the property purchased.
The agreement therefore enters into and becomes a part of the consideration.
The buyer submits to a burden upon his own land because of the fact that a like
burden imposed on his neighbor’s lot will be beneficial to both lots. The
covenant or agreement between the original owner and each purchaser is
therefore mutual. The equity in this particular class of action is dependent as
much on the existence of the general scheme of improvement or development as on
the covenant, and restrictions which contemplate a general building plan for
the common benefit of purchasers of lots are recognized and enforced by courts
of equity at the instance of the original grantor or subsequent purchasers.

 

Hooper,
171 S.W. at 272; see also Evans, 796 S.W.2d at 466 (noting that “the
concept of a general plan of development is . . . frequently connected to . . .
standing questions”); Curlee, 
112 Tex. 40, 244 S.W. at 498 (“It was implied in each contract that every other
contract should have these same provisions of restrictions, as they were for
the benefit of all, and at once formed an inducement to each purchaser.”).

The standing of a property owner within a subdivision to enforce a
restrictive covenant against another similarly situated property owner does not
turn on whether the deed of the owner against whom enforcement is sought contains
the restriction.  If the deed of the property owner against whom enforcement of
the restriction is sought contains the restriction, standing is based on an
implied mutuality of covenants among the various purchasers within the
subdivision.  See, e.g., id.; Giles, 697 S.W.2d at 427
(holding that where many property owners are interested in a restrictive
covenant, any one of them can sue to enforce it); Hooper, 171 S.W. at 272
(standing is predicated on mutuality of covenant between original owner and
each purchaser).  If, on the other hand, the deed does not contain the
restriction, standing is based on application of the doctrine of implied
negative reciprocal easement.  See, e.g., Evans, 796 S.W.2d at 466;
Lehmann, 510 S.W.2d at 681 (standing to enforce restrictive covenant may
be based “either upon the theory that there is a mutuality of covenants and
consideration, or upon the ground that mutual negative equitable easements are
created”).  The doctrine of implied reciprocal negative easement applies when a
developer sells a substantial number of lots within a subdivision by deeds
containing the restrictive covenant, and the party against whom the restriction
is sought to be enforced had notice of the restriction but the deed did not actually
contain the restriction.  Evans, 796 S.W.2d at 466.

Importantly, the analysis of whether a general plan or scheme of
development exists is the same whether a party is attempting to enforce an
express restriction (i.e., one that is contained in the deed of the party
against whom enforcement is sought) or seeking application of the doctrine of
implied reciprocal negative easement.  Id.; Curlee, 112 Tex. 40, 244 S.W. at 498.  The only meaningful difference between the two situations is
that the party seeking to enforce an implied negative easement has the
additional burden to demonstrate that a “substantial number” of the deeds
conveying property within the subdivision contain the restriction.  Evans,

796 S.W.2d at 466.

 

B.        General
Principles Applied

Ski Masters asserts that the Residents do not have standing because there
was no overall development plan for the 6.76 acre tract, and even if there was
such a plan, it was abandoned.  The Residents respond that evidence supports the
trial court’s findings that Carlson intended a “general plan or scheme” that
the 6.76 acre tract be a residential subdivision and that this general plan or
scheme has not been abandoned or waived.  In analyzing this issue, we are
mindful that the existence of a general plan or scheme, and whether such a plan
or scheme has been abandoned, are fact issues.

            1.         Evidence
of General Plan or Scheme of Development

The evidence supporting the trial court’s finding that a general plan or
scheme existed for the Carlson Subdivision is compelling.  The Fleming Deed
states that “Grantor . . . , by this instrument subjects the remainder of the
6.76 acres of land with these same restrictions, conditions and option, whether
embodied in future instruments of conveyance or not.”  (emphasis added) 
The Fleming Deed also provides that the restrictions renew automatically and
can be waived or changed only by vote of the majority of property owners in the
Carlson Subdivision, further evidencing a general plan or scheme.  Evans,
796 S.W.2d at 470.

Ski Masters had notice of the residential-only restriction.  Hooper,
171 S.W. at 272.  Ennis testified that he was aware of the residential-only
restriction when he bought the property and admitted that his realtor attempted
to have all owners of properties in the Carlson Subdivision sign a waiver of
this restriction.  Also, a “substantial number” of the lots within the planned
development scheme (eight of ten) were conveyed with the restriction at issue. 
Evans, 796 S.W.2d at 466.  Finally, there was testimony from the Residents
that uniformity of the residential-only restriction within the subdivision was
part of their inducement to purchase property in the subdivision.  Hooper,
171 S.W. at 272.

            2.         General
Scheme or Plan Not Negated as a Matter of Law

Ski Masters argues that, as a matter of law, there was no scheme or plan,
noting that (1) Carlson conveyed tracts 2 and 4 without the residential-only
restriction, (2) the plat referenced in the restriction was never recorded, and
(3) the ten original tracts have been re-subdivided in significant ways.

            (1)        Conveyances by Carlson without the restrictions

The argument that the existence of a general plan or scheme was negated
by the conveyance of two tracts without the restriction at issue was raised and
rejected in Hooper. Id.  The Hooper court noted that
uniformity of restrictions and deviation from that uniformity are “evidentiary
matter[s] only,” and that “[t]here may . . . be departures from the usual
restrictions in individual cases without destroying the integrity of the scheme
of development as a whole.”  Id.  This Court previously explained why
lack of complete uniformity of restrictions does not, as a matter of law,
preclude a finding of a general scheme or plan:

[W]here a
subdivision has been placed upon the market with a declared intention that it
will be developed as a restricted residential district and enhanced values are
paid for the lots on this representation, the failure of the developer to
include uniform restrictions in all deeds or his failure to include any
restrictions in one or more deeds would not of itself take away all of the
rights of the other purchasers to have the district maintained as a restricted
residential district. [Otherwise,] a subdivider might sell hundreds of lots for
enhanced prices, upon the representation that the district was to be a
restricted residential district, and then by his failure, either through
inadvertence or otherwise, to include such restrictions in one deed, destroy
the entire scheme or plan for a restricted residential subdivision. We refrain
from making such a holding.

 

Bethea v.
Lockhart, 127 S.W.2d 1029, 1031 (Tex. Civ. App.—San Antonio 1939, writ
ref’d).

                        (2)        Failure
to record the plat

Likewise, Carlson’s failure to record the plat is not dispositive of the
existence of a general scheme or plan.  In Lehmann, this Court rejected
the argument that, as a matter of law, there can be no general scheme or plan
where the plat reflecting the subdivision “is not filed of record.”  510 S.W.2d
at 679.  The parties seeking to enforce the restrictive covenant in that case,
like the Residents here, did not rely exclusively on unrecorded plat, but
presented other evidence to establish the existence of general plan or scheme. 
This evidence included the presence of the restriction in numerous other deeds
for properties in the subdivision and reliance by purchasers on the existence
of the restrictions for all properties within the subdivision as an inducement
to purchase.  Id. at 680.[1]

(3)        Redrawing the boundaries within the
6.76-acre tract

Finally, Ski Masters argues that no general scheme or plan could be said
to exist at the time it purchased its property because the boundaries of tracts
4 and 5 had been redrawn, and the tract owned by Ski Masters consisted of all
of original tract 4, a portion of original tract 5, and other property lying entirely
outside the original 6.76 acres.  Moreover, the boundaries of other tracts from
the original ten had also been redrawn, and the Residents failed to object to
any of these “re-drawings.”  Ski Masters asserts that, as a matter of law, under
these circumstances, whatever general plan or scheme might have existed at some
point for the ten tracts platted for the original subdivision cannot be said to
exist as to its tract.

Ski Masters cites no authority directly supporting this argument, and our
research did not reveal any such authority.  Ski Masters notes, and we agree,
that absent an express covenant that precludes further subdivision, a property
owner is free to subdivide her property in any lawful manner as she sees fit.  McDonald
v. Painter, 441 S.W.2d 179, 184-85 (Tex. 1969).  This does not, however,
mean that such “re-subdivision” negates the existence of a general plan or
scheme as a matter of law.

            Whether
a general plan or scheme of development exists is a fact question, and some
evidence supports the trial court’s finding that such a scheme exists.  Hooper,
171 S.W. at 272; see also Restatement
(Third) of Property: Servitudes § 2.14 cmt. f (2000) (“Existence of a
general plan is a question of fact to be determined from the circumstances.”). 
Significantly, Andrew Eastwood, the person who received the initial conveyance
of tract 4 by a deed with no restrictions, accomplished the “re-subdivision”
that Ski Masters relies on in asserting that the general plan or scheme was
negated.  Before selling tract 4, Eastwood acquired that part of tract 5 that
is now part of the “new” tract 4 (owned by Ski Masters).[2]  When Eastwood sold “new” tract 4, he
included in the deed the very same restrictions that burdened all but one of
the other original grantees of tracts in the Carlson Subdivision, and he did so
by referencing the Fleming Deed by volume and page number, just as was done in
the other deeds.

A reasonable inference to be drawn from this evidence is that Eastwood
was aware of the residential-only restrictions and intended his property to be
burdened like all other properties within the general plan or scheme.  It can
also be reasonably inferred from this evidence that Carlson’s omission of the
restriction from Eastwood’s deed was not an expression about the general plan
or scheme, but perhaps was an oversight.  Accordingly, Eastwood’s
“re-subdivision” of tract 4 does not negate the existence of the general plan
or scheme as a matter of law.

Moreover, the Residents presented evidence that they purchased property
within the subdivision based in part on the residential-only restriction.  Hooper,
171 S.W. at 272.  The fact that many years had elapsed since their purchases
and that some of the tracts had redrawn boundaries does not alter the
Residents’ reliance on the restriction at the time of their purchases.

            Accordingly,
the trial court did not err in concluding that Ski Masters’ property is bound
by the residential-only restriction.

3.         Abandonment

            Alternatively,
Ski Masters asserts that the general plan or scheme was “abandoned” and is,
therefore, no longer binding on it or any other property owner in the Carlson
Subdivision.  Abandonment occurs when there are “substantial violations within
the restricted area.”  Cowling v. Colligan, 312 S.W.2d 943, 945 (Tex. 1958).  Ski Masters had the burden of proof to demonstrate that the general scheme was
abandoned.  Giles, 697 S.W.2d at 427.  To meet this burden, Ski Masters
had to prove that the violations of the restriction were “so great as to lead
the mind of the ‘average man’ to reasonably conclude that the restriction . . .
has been abandoned and its enforcement waived.”  Oldfield v. City of Houston, 15 S.W.3d 219, 226-27 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)
(superseded by statute on other grounds).

In support of its abandonment theory, Ski Masters points to the facts
that Carlson did not record the plat and sold two of the ten properties without
the residential-only restriction.  We have already rejected the argument that
these facts alone can negate the existence of a general plan or scheme.  The
only other evidence presented by Ski Masters on the issue of abandonment was
that one of the Residents appeared to be using his property for business
purposes.  Three of the property owners testified, however, that there has been
no non-residential use of any property in the subdivision, and the property
owner alleged to have conducted business on his subdivision property testified
without contradiction that his use of the property was for personal purposes only. 
Thus, there is some evidence supporting the trial court’s conclusion that there
was no abandonment of the general scheme of development.

 

 

C.        Inconsistent
Findings and Conclusions

            Ski
Masters also asserts on appeal that where express restrictions exist, an
implied reciprocal negative easement cannot.  Owens, 241 S.W.3d at 131. 
According to Ski Masters, the trial court’s conclusion that the Ski Masters
tract is burdened with an express restrictive covenant cannot be reconciled
with its conclusion of law that the tract is the subject of an implied
reciprocal negative easement, and these contradicting conclusions of law cannot
stand.  Id.

            The
Austin Court of Appeals recently held that “an implied reciprocal negative
easement cannot arise where, as here, the subject property was sold with
express restrictions that are the same as those allegedly implied.”  Id.  This holding, however, is limited to its context.  In Owens, the
property at issue was directly burdened by a restrictive covenant that, by its
terms, was to last twenty-five years unless renewed by a majority of the
property owners.  Id. at 129-30.  The property owners did not renew the
restriction until two years after its expiration.  Id. at 130.  Because
this was not timely, the restrictive covenant had expired and could not be
enforced.  Id.  The court refused to imply a covenant where the grantor
had made express restrictions.  Id. at 131.  Because the grantor
intended a twenty-five-year restriction that expired if not renewed, and the
restriction was not renewed, an implied restriction under these circumstances
would be contrary to the will of the grantor.

Here, the grantor expressed the converse intent – that the
residential-only restriction would renew automatically if not expressly waived
by a majority of the property owners.  Ski Masters’ realtor unsuccessfully
sought such a waiver from the property owners.  Under these circumstances, it
would be contrary to the will of the grantor to refuse to imply a restrictive
covenant because there is an express covenant in Ski Masters’ chain of title.

Moreover, Ski Masters’ argument disregards that the Residents pled the
doctrine of implied reciprocal negative easement as an alternative basis for
relief.  Even assuming that the trial court erred in finding that the property
was burdened both expressly and impliedly, such an error is not reversible
because some evidence supports the trial court’s judgment enforcing the
residential-only restriction against Ski Masters.  Lifshutz, 199 S.W.3d
at 17 (“Incorrect conclusions of law will not require a reversal if the
controlling findings of fact will support the judgment under a correct legal
theory.”).

D.        Attorneys’
Fees

            Finally,
Ski Masters challenges the award of trial and appellate attorneys’ fees to the Residents. 
Under section 5.006 of the Texas Property Code, “[i]n an action based on breach
of a restrictive covenant pertaining to real property, the court shall allow to
a prevailing party who asserted the action reasonable attorney’s fees in
addition to the party’s costs and claim.”  Tex.
Prop. Code Ann. § 5.006 (Vernon 2003).  This statute is mandatory; a
court has no discretion to not award fees to a prevailing party.  Gorman v.
Countrywood Prop. Owners Ass’n, 1 S.W.3d 915, 918 (Tex. App.—Beaumont 1999, pet. denied).

            Ski
Masters does not contest the reasonableness of the amount of fees awarded or
the sufficiency of the evidence to support the fee awards.  Ski Masters’s only
contention is that, because the trial court’s judgment on the restrictive
covenant issue should be reversed, the attorneys’ fees awards should likewise
be reversed.  Because we affirm the judgment, we also affirm the award of
attorneys’ fees.  Tex. Prop. Code
§ 5.006.[3]

Conclusion

            The
trial court found that a general scheme of development existed for the Carlson
Subdivision, and that Ski Masters’ property was bound by the residential-only
restriction characterizing this scheme.  From this, the trial court concluded
that the Residents had standing to enforce the residential-only restriction and
entered a judgment enjoining Ski Masters from violating that restriction.  Some
evidence supports the trial court’s findings, and the trial court committed no
legal error warranting reversal.

            Accordingly,
the judgment of the trial court is affirmed.

 

Rebecca Simmons, Justice









[1] Ski Masters argues that none of the deeds after the
Fleming Deed contain the residential-only restriction because the references in
those deeds to the restrictions “set out and recorded in Volume 311, Page 208
of the Guadalupe County deed records [i.e., the Fleming Deed]” are merely
limits on Carlson’s potential liability for breach of warranty.  This argument
is without merit.  See Bethea, 127 S.W.2d at 1030 (enforcing restrictive
covenant against party whose deed “incorporated restrictions to the effect that
the property was to be used for residence purposes only” by reference to volume
and page numbers of other recorded instruments).





[2] Eastwood did not sell the tract to
Ski Masters; there were other owners of the tract between Eastwood and Ski
Masters in the chain of title.





[3] Ski Masters noted (without citation
or argument) in its Brief of the Appellants that the trial court erred in not
conditioning the appellate attorneys’ fees award on the Residents’ success on
appeal.  “[A]ny award of attorney’s fees on appeal must be conditioned on the
receiving party’s success.”  Westech Eng’g, Inc. v. Clearwater Constructors,
Inc., 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ).  Because the
Residents succeeded on appeal, any error in this portion of the judgment is
harmless.  See ASAI v. Vanco Insulation Abatement, Inc., 
932 S.W.2d 118, 123 n.3 (Tex. App.—El Paso 1996, no writ).