

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00009-CV

IN THE INTEREST OF J.H. AND
D.H., CHILDREN

----------

FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 324-543049-13

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Mother, who is proceeding pro se on appeal, raises three issues and numerous subissues attempting to challenge the proceedings held in the trial court and the final decree of divorce. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother married on February 24, 2009, and two children, J.H. (Daughter) and D.H. (Son), were born during the marriage. The parties ceased living together in December 2011, and Father filed for divorce in September 2013. At the time of the trial, Daughter was six years old, and Son was almost four years old.

### A. The Divorce Trial[2]

Father testified that he is employed as an air traffic controller. Father testified that Mother had been diagnosed with bipolar disorder.[3] While they were married, Father noticed that Mother's mental condition had deteriorated; Mother attempted suicide and threatened violence against Father and the children. Father testified that Mother had threatened to kill herself four or five times and that she had attempted suicide with pills and alcohol twice—once in 2010 and again in 2011. Father testified that Mother had assaulted him on multiple occasions, including attempting to stab him with a knife and punching him while he was asleep. Father testified that Mother had threatened to drown Daughter in

---

[2]At the outset of the divorce trial, at which Mother appeared pro se, the parties stipulated to the division of personal property and debts and the maintenance of health insurance for the children.

[3]Father testified that Mother had also been diagnosed with schizophrenia but that she had disagreed with the diagnosis because she had wanted a diagnosis of post-traumatic stress disorder (PTSD). Mother went to a different psychiatrist, who diagnosed Mother with bipolar disorder, and Mother was satisfied with that diagnosis.

the bathtub and had threatened to stab Father and Daughter. Father said that Mother had also thrown items at the children.

Father explained that CPS had received a referral regarding Mother in May 2013. The referral was triggered after Father stopped paying for daycare because Mother was not working and Mother told the daycare workers that she should receive free daycare. When the daycare workers asked Mother why she needed daycare if she was not working,[4] Mother told them that she might become homicidal toward the children because they stressed her out. CPS instructed Father to care for the children until further notice; Mother was allowed supervised contact only.

When, in October 2013, CPS authorized Mother's unsupervised possession of the children on a standard possession schedule, Mother failed to follow the schedule. She claimed that CPS told her not to return the children to Father, and Father was forced to file a writ of habeas corpus to obtain the return of the children.

Charlotte McWilliams with Tarrant County Family Court Services prepared a social study and recommended that Father retain custody of the children but that Mother be given increased access to them.

Edna Roberts, a pastor and director of a church daycare center, testified that Mother had enrolled Daughter in the church's daycare in September 2011

---

[4]Father testified that Mother was unemployed because she believed that she had PTSD from working as a 911 dispatcher at the police department.

and had enrolled Son four months later. According to Roberts, when Mother brought the children to daycare, they "were almost immaculate every day in their dress" and that when Father brought the children to daycare, "they were disarrayed[,] and their hair was not combed."

Mother testified that Father constantly threatened her and once tried to coerce her into killing herself. Mother said that Father is mentally abusive and had previously pushed her into a wall and into a television.

Mother denied abusing or neglecting her children. Mother explained that she had been in counseling for four years and said that her psychiatrist of three years had no issues with Mother caring for her children. Mother denied that she was an unfit mother and pointed out that her other daughter, who lived with Mother and was not Father's child, was doing excellent in school and had never been in trouble.

Mother denied that she had ever threatened or attempted suicide. Mother admitted that she had been diagnosed with bipolar disorder, PTSD, and panic disorder, but denied having been diagnosed with schizophrenia. Mother agreed, however, that she had indicated on her Supplemental Security Income form that she had bipolar disorder, schizophrenia, and "everything [she] could."

Mother last worked in 2010, when she was laid off from her job as a 911 dispatcher while she was on "stress leave." Mother testified that she was currently receiving Social Security disability benefits due to neuropathy. Mother said that despite her low income, she had the ability to support, care for, and

4

educate her children. When the trial court questioned how Mother was able to take care of two little children but was unable to sit in an office and work, Mother agreed that she was capable of working in an office if she had to. Mother testified that it was not in the children's best interest for Father to be appointed their managing conservator because Father had an unusual work schedule, had allowed his brother—who had allegedly abused drugs and alcohol—to pick up the children from daycare, and had taken the children out of daycare.

After the divorce trial, the trial court summarized its rulings in two letters to the parties. Mother and Father were appointed as joint managing conservators; Father was granted the exclusive right to establish the domicile of the children within a ten-mile radius of the children's current residence; Father was granted the exclusive right to make educational and significant legal decisions for the children; a week-on/week-off possession schedule was set; neither party was ordered to pay child support;[5] the parties' agreement to the division of property was confirmed; and the divorce was granted.

## B. Motion to Modify the Prior Ruling and Application for a Protective Order

Before the trial court signed a final decree, however, Father filed a motion to modify the trial court's rulings due to new evidence, a motion for a protective

---

[5]The trial court noted in its letter that based on Mother's testimony, "it appears that she is underemployed and could go back to work if she was willing to do so." The trial court also stated, "I have concerns that she is simply failing to work since she is receiving disability and charitable contributions in order to remain financially afloat."

5

order, and a petition for writ of habeas corpus. The trial court set Father's motions for a hearing. The day before the hearing, Mother filed a pro se "Rule 11 Agreement-Reset" and a motion for continuance. On the day of the hearing, Mother appeared in court and executed a form titled, "Pro Se Appearance." Beside her signature on the form, Mother wrote "is here to ask for a continuance for representation." When the trial court called the case for a hearing on Father's motions, however, Mother was not present in the courtroom. The bailiff indicated that Mother had spoken with him prior to leaving the courtroom, and the trial court asked the bailiff to take the witness stand. The bailiff testified that he had a conversation with Mother before she left and had advised her not to go too far because her case would be called shortly. The bailiff testified that Mother "just kept walking." The bailiff had later called Mother's cell phone and left a message; Mother returned his call; and he advised Mother that the trial court had said her case would be called at 9:45 and that if she was not present at 9:45, "her case would be defaulted." Mother told the bailiff that she needed a continuance and asked whether she could participate by phone. The bailiff checked with the trial court and told Mother that the trial court had declined her request to participate by phone.

The trial court then asked the bailiff to call Mother's name three times at the door; the bailiff complied, and Mother did not appear. The trial court denied Mother's motion for continuance because she did not appear to argue her

6

motion. The trial court stated that the hearing on Father's motion to modify the prior ruling would be conducted despite Mother's absence.

Father testified that he had registered the children for school at Dallas Park Elementary—the school that corresponds with Father's residence. But Father learned on August 17 that Mother had taken the children out of Dallas Park Elementary and had enrolled them in J.A. Hargrave Elementary. Father spoke with the principal at J.A. Hargrave who confirmed that Son was not eligible to attend pre-k at J.A. Hargrave and that the children should be attending Dallas Park. Father unenrolled the children from J.A. Hargrave and re-enrolled them at Dallas Park. Mother attempted to unenroll the children from Dallas Park a second time but was unsuccessful because all of the school's officials had been alerted to the situation.

When Father picked up the children from Mother's home around August 15, he noticed that Daughter "was carrying her arm a little strangely." Daughter told Father that Mother had hit her and had hurt her arm and that it had been hurt for a few days. Daughter said that she had not been to the doctor or to the hospital. Father took Daughter to the emergency room at Cook Children's Hospital, where Daughter was diagnosed with a fractured right clavicle. At the hospital, CPS and the police got involved; Father said that the CPS case was still pending.

Father learned that the children were not attending school during Mother's weeks of possession; at the hearing, Father tendered and the trial court admitted

7

into evidence a copy of the children's school attendance record, showing that they had missed school during Mother's periods of possession. Father testified that Daughter had follow-up doctor appointments for her shoulder and that Mother had rescheduled the appointments twice without telling Father and then did not take Daughter to the rescheduled appointments. Father testified that at the time of the hearing on September 23, he had not seen the children in three weeks. Although Father had called and texted Mother, requesting to see and to speak with the children, and had gone to Mother's house, she did not answer the door and would not allow Father access to the children. Father testified that he had last spoken to Mother the Thursday before the hearing and that she said that she would call the police if he came to her house.

Father testified that he had missed approximately one week of work due to dealing with Mother's "shenanigans" and that it was starting to jeopardize his job. Father asked the trial court to appoint him as sole managing conservator of the children, to allow him to move the children to Longview, to order Mother to pay child support, and to order Mother to pay attorney's fees. Father testified that appointing him as sole managing conservator is in the children's best interest and is necessary to protect the children's physical and emotional well-being. Father reiterated Mother's previous threats to kill the children and testified that he had concerns for the safety and welfare of the children. Father said he felt that the children were in serious, immediate danger and that he was requesting any protective order that the trial court deemed necessary.

After Father's attorney put on evidence of his attorney's fees, the trial court set aside its conservatorship rendition from the July 20 trial. Based on evidence presented at both the trial and at the post-trial hearing on Father's motion, the trial court signed a final decree ordering that Father be appointed as sole managing conservator of the children with all the rights of a sole managing conservator, that Father had the right to establish the children's residence without any geographic restriction, and that Mother be appointed as possessory conservator of the children. The trial court made further orders, including that Mother pay child support of $235 monthly; that Father maintain health insurance for the children; that Mother have supervised visitation at the visitation center at the courthouse or a similar facility in the town where Father relocates and that Mother pay any fees for visitation; that a writ of attachment issue immediately for the children; and that Father's attorney have a judgment against Mother in the amount of $3,600 for trial attorney's fees and $7,500 for appellate attorney's fees in the event of an unsuccessful appeal by Mother.

### C. Motion for New Trial

Mother hired counsel and filed a motion for new trial and to abate the final decree of divorce. Father filed a response, and the trial court set a hearing on the motion and response. After hearing arguments from both sides and testimony from Mother, the trial court signed an order denying Mother's motion for new trial and to abate the final decree of divorce.

After the hearing on her motion for new trial, Mother discharged her attorney and filed a pro se request for findings of fact and conclusions of law. The trial court asked the parties to prepare proposed findings of fact and conclusions of law, but only Father complied. The trial court ultimately made seventy-five findings of fact and eighteen conclusions of law. Proceeding pro se, Mother perfected this appeal raising three issues.[6]

## III. ISSUE 1

Mother's first issue is worded to complain that the final decree of divorce, findings and conclusions, and orders were unconstitutional, were an abuse of discretion, were contrary to lawful guidelines and statutes, were not in the best

---

[6]Mother's three issues on appeal are as follows:

1.    Whether the trial court[']s Final Decree of Divorce[,] conclusions, findings[,] and orders were rendered unconstitutionally, under an abuse of discretion, contrary to lawful guidelines and statutes, against the best interest of the children standard, and in opposition of the legal, factual, sufficient, preponderance of the evidence?

2.    Whether the Final Decree of Divorce should be vacated, modified, reversed[,] or remanded in the interest of justice because the Appellant ("mother") was denied due process of law and due diligence for close to three years in this cause?

3.    Whether the orders and findings of the Final Decree of Divorce and the order denying Appellant's Motion for New Trial are void and should be abated because the trial judge prevented Appellant ("mother") from presenting a complete record for appeal by denying appellant public hearings in open court, denying her basic jurisprudence, and rendering judgment in a manner inconsistent with due process?

10

interest of the children, and were not supported by legally and factually sufficient evidence. Mother's arguments under this issue, however, do not match the complaints stated in her issue. We address the arguments actually presented under Mother's first issue to the extent we are able to ascertain them. *See* Tex. R. App. P. 38.1(f).

Mother argues that she was not given three days' notice of the hearing on Father's post-trial motion as required under Texas Rule of Civil Procedure 21(b). *See* Tex. R. Civ. P. 21(b). But the proposed "Rule 11 Agreement-Reset" Mother filed recites that "I was served with your Motion to Modify this Saturday on September 19, 2015. The court date is set for September 23, 2015." And the certificate of service indicates notice was served on Mother on September 16, 2015. Thus, the record before us reflects that Mother was provided with more than three days' notice of the September 23, 2015 hearing. *See id.*; *see also Graham-Rutledge & Co. v. Nadia Corp.*, 281 S.W.3d 683, 692 (Tex. App.— Dallas 2009, no pet.) (recognizing that certificate of service by attorney is prima facie evidence of fact of service and is conclusive in absence of proof that notice or document was not received).

Mother also argues that the final divorce decree is void for lack of due process because "[a] proper inquiry into the substantial change of circumstances and the best interests of the children did not occur because both parties were not given an equal opportunity to prepare." But Mother chose to leave the courtroom and to not argue or to present her motion for continuance to the trial court.

11

Accordingly, Mother cannot now complain about the trial court's failure to grant her a continuance to prepare or to obtain counsel. *See* Tex. R. App. P. 33.1 (generally recognizing that request must be made to trial court as a prerequisite to presenting complaint for appellate review). Moreover, we note that Mother's motion for continuance was not verified or "supported by affidavit"; under such circumstances, we presume that the trial court did not abuse its discretion by denying her motion for continuance. *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *In re A.D.A.*, 287 S.W.3d 382, 387 (Tex. App.—Texarkana 2009, no pet.).

Mother further argues that Father's motion to modify the trial court's judgment was not in conformity with rule 45 because it was not verified and was so vague that it did not give her fair notice of the facts upon which it was based. *See* Tex. R. Civ. P. 45. But Rule 45 does not require verification, and our review of Father's motion demonstrates that it adequately provided fair notice to Mother given the allegations as a whole. *See id.*; *see, e.g.*, *Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007) (recognizing Texas's fair-notice pleadings standard is satisfied when the opposing party can ascertain the nature and basic issues of the controversy and the type of evidence that might be relevant to the controversy); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000) (recognizing that the purpose of fair-notice pleadings rule is to give opposing party sufficient information to prepare a defense).

12

Mother next argues that the trial court's findings in the final decree of divorce relating to conservatorship are legally and factually insufficient. Specifically, Mother argues that there was no evidence that naming Father sole managing conservator was in the children's best interest because he was not home on a daily basis. In determining conservatorship, the best interest of the child shall be the primary consideration. Tex. Fam. Code Ann. §§ 153.002, .134(a) (West 2014). As set forth in detail above, the evidence showed that during Mother's possession periods following the divorce trial, she unenrolled the children from the school where Father had them enrolled and moved them to a school that Son was not qualified to attend; she did not take the children to school; she refused to return the children to Father for his periods of possession, which required Father to obtain a writ of attachment for their return; she failed to seek medical treatment for a fracture to Daughter's clavicle that occurred while Daughter was in Mother's care; and she continued to suffer mental health issues, triggering concerns about Mother's past threats to harm the children. The trial court expressed concern that the children would suffer serious physical harm or be removed from the state if they were to remain in Mother's possession. This evidence sufficiently supports the trial court's decision to exercise its discretion to determine that it was in the children's best interest to appoint Father as sole managing conservator and Mother as possessory conservator of the children. *See, e.g., Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (stating trial court possesses wide latitude in determining best interest of minor child); *see*

13

*also In re Marriage of Robinson*, 16 S.W.3d 451, 454–56 (Tex. App.—Waco 2000, no pet.) (upholding appointment of husband as sole managing conservator in circumstances similar to those here).

Mother argues that the trial court abused its discretion by creating its own child support guidelines when the trial court deemed her to have net monthly resources of $940 and ordered her to pay $235 per month in child support. Mother contends that the trial court abused its discretion by finding that she was intentionally not employed. The trial court has the discretion to apply the support guidelines to the earning potential of an obligor if it determines an obligor is intentionally unemployed or underemployed. *See* Tex. Fam. Code Ann. § 154.066 (West 2014); *Iliff v. Iliff*, 339 S.W.3d 74, 81 (Tex. 2011). Mother testified at trial that despite her neuropathy, for which she was receiving $730 per month in disability, she was capable of working in an office. Mother testified that she had previously earned $45,000 to $50,000 per year (or $3,750 to $4,167 per month) as a 911 dispatcher with the Fort Worth Police Department. Based on Mother's testimony, the trial court issued findings that Mother was intentionally underemployed and was voluntarily remaining unemployed and set Mother's monthly child support payments at $235 based on deemed net monthly resources of $940 per month. *See* Tex. Fam. Code Ann. § 154.125(b) (West Supp. 2015) (setting forth child support guidelines and requiring trial court to presumptively apply the following schedule in rendering child support: "2 children [=] 25% of Obligor's Net Resources"). Applying this standard, the trial court did

14

not abuse its discretion in its child support determination. *See* Tex. Fam. Code Ann. §§ 154.066, .125(b); *Iliff*, 339 S.W.3d at 83.

In four pages of her brief at the end of her first issue, Mother makes bare assertions of error, without meaningful argument or authority, regarding findings of fact 15, 18, 19, 25, 28 through 32, 39, 50 through 53, 58 through 75. Because bare assertions of error, without meaningful argument or authority, waive error, these contentions of error by Mother are waived. *See Bufkin v. Bufkin*, 259 S.W.3d 343, 354 (Tex. App.—Dallas 2008, pets. denied); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (observing that appellate court has discretion to deem issues waived due to inadequate briefing).

## IV. Issue 2

In her second issue, Mother argues that she was denied due process and due diligence because the case was not disposed of within six months and because of the trial court's alleged bias and prejudice.[7]

Mother complains that the case was not disposed of within six months from the appearance date.[8] Texas Rule of Civil Procedure 165a(2) provides that

---

[7]To the extent Mother's second issue again includes a challenge to the sufficiency of the evidence concerning the trial court's conservatorship and possession determinations, we have addressed these contentions in connection with her first issue.

[8]Mother's reliance on Texas Government Code section 74.024 for this proposition is misplaced; that section broadly states that "[t]he supreme court may adopt rules of administration setting policies and guidelines necessary or

15

"[a]ny case not disposed of within the time standards promulgated by the Supreme Court under its Administrative Rules *may* be placed on a dismissal docket." Tex. R. Civ. P. 165a(2) (emphasis added). Because the rule is permissive rather than mandatory, Mother has not shown herself entitled to any relief on appeal. *See* Tex. Gov't Code Ann. § 311.016(1) (West 2013) (explaining that "may," when used in a statute, indicates that the provision is discretionary, not mandatory); *Black v. Dietzman*, No. 02-14-00165-CV, 2015 WL 1869084, at *2 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op.) (holding that rule 165a is permissive and provided no relief on appeal when appellant challenged length of time case had remained pending in trial court).

Mother also contends that the trial court was biased or prejudiced against her, depriving her of a fair trial. Mother alleges that the trial court demonstrated its bias or prejudice by (1) allegedly reprimanding Mother, (2) allegedly denying her motion to amend temporary orders to accommodate the vacation of Father's attorney, (3) allegedly sending an ex parte letter to Father's attorney, and (4) allegedly sending her a letter stating that he would not address her letter requesting help in obtaining an emergency injunction. But judicial remarks during

desirable for the operation and management of the court system and for the efficient administration of justice." *See* Tex. Gov't Code Ann. 74.024(a) (West 2013). The rule governing contested family law cases is Texas Rule of Judicial Administration 6.1(c)(1). *See* Tex. R. Jud. Admin. 6.1(c)(1) (providing that district court judges should, "so far as reasonably possible," ensure that contested family law cases are disposed of within six months from appearance date or within six months from the expiration of the waiting period provided by the family code where such is required, whichever is later).

16

the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases ordinarily do not support a bias or partiality challenge. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001). Nor do a judge's expressions of impatience, dissatisfaction, annoyance, or even anger establish bias; a judge's ordinary efforts at courtroom administration will not support an assertion of judicial bias or prejudice. *See id.* at 241 (holding no evidence of judicial bias existed based on careful examination of judge's allegedly improper comments in context of entire record); *In re D.L.S.*, No. 02-10-00366-CV, 2011 WL 2989830, at *5 (Tex. App.—Fort Worth July 21, 2011, no pet.) (mem. op.) (holding that, on record presented, trial judge did not demonstrate any bias). Moreover, Mother's allegations of judicial bias and prejudice are not substantiated by the record.[9]

We overrule Mother's second issue.

## V. ISSUE 3

In her third issue, Mother argues that the trial court prevented her from presenting a complete record for appeal. Mother raises multiple arguments within her third issue; below, we discuss those that are discernable.

---

[9]The record reflects that the trial court sustained several of Mother's objections; allowed inordinate leeway when Mother attempted to lay predicate for exhibits; and took the time to explain procedural issues to Mother, such as why she would not be allowed to question witnesses about certain exhibits, as well as why certain exhibits were not admissible.

Mother argues that due to the "destroyed inaudible portions of the reporter's records in this cause, . . . Appellant is entitled to a new trial." Mother apparently complains that the court reporter did not report and transcribe portions of the proceedings that were not audible to her. Mother asserts that "the trial judge literally advised Appellant ('mother') off the record not to object because she would get her turn during her testimony."[10] Mother forfeited any error concerning "off-the-record" comments by failing to object to the court reporter's failure to record the comments or to take other steps to ensure the record reflected what had occurred. *See Rittenhouse v. Sabine Valley Ctr. Found., Inc.*, 161 S.W.3d 157, 162 (Tex. App.—Texarkana 2005, no pet.) (holding alleged error in court reporter's failure to report hearing on motion not preserved when appellant failed to object at hearing); *see also, generally, Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 387 (Tex. 2008)

---

[10]During the trial, while Mother was questioning McWilliams, the following dialog took place:

Q. [By Mother] And you stated that my -- what did you state my diagnosis was?

A. I believe I said that it was bipolar disorder.

Q. That's not my diagnosis.

THE COURT: That's what she testified to. I'll let you testify about your diagnosis when it is your turn.

We are unsure whether this exchange forms the basis of Mother's complaint.

18

(recognizing that "[t]he cardinal rule for preserving error is that an objection must be clear enough to give the trial court an opportunity to correct it").

Mother argues that a typographical error in the trial court's finding of fact number 70 caused her irreparable harm. Because Mother does not explain how this typographical error purportedly caused the rendition of an improper judgment, any error stemming from the alleged typo is harmless. *See* Tex. R. App. P. 44.1(a) (providing that no civil judgment may be reversed unless error complained of probably caused rendition of an improper judgment); *see also H.H. Holloway Trust v. Outpost Estates Civic Club Inc.*, 135 S.W.3d 751, 754 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding typographical error in finding of fact harmless).

Finally, Mother also argues that she was denied an opportunity to be heard in a public trial. The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI. The Sixth Amendment right to a public trial is limited to criminal prosecutions; Mother cites no authority for the proposition that this right applies to a civil trial. Moreover, we have reviewed the portions of the record cited by Mother as violating her right to a public trial, and the record does not support her contention; witnesses were excluded because the rule was invoked, but that does not render a trial a nonpublic trial. *See* Tex. R. Civ. P. 267(a) (providing that at the request of a

19

party in civil case, witnesses shall be sworn and removed from the courtroom to some place where they cannot hear testimony of other witnesses).

We overrule Mother's third issue.

## VI. CONCLUSION

Having overruled Mother's three issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  WALKER, MEIER, and SUDDERTH, JJ.

DELIVERED:  June 2, 2016

20