# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00441-CV

**Appellants, Reba A. Byrd, Individually and as Trustee of Reba Byrd Trust, and Charles Sampley// Cross-Appellants, Ali Mahrou and Gypsie Mahrou**

**v.**

**Appellees, Ali Mahrou and Gypsie Mahrou// Cross-Appellees, Reba A. Byrd, Individually and as Trustee of Reba Byrd Trust, and Charles Sampley**

---

### FROM THE DISTRICT COURT OF BLANCO COUNTY, 424TH JUDICIAL DISTRICT NO. CV07130, HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This is a dispute over the existence and scope of easements affecting real property in Blanco County. Reba A. Byrd, Individually and as Trustee of Reba Byrd Trust, and Charles Sampley (collectively, "Byrd") sued Ali Mahrou and Gypsie Mahrou seeking declaratory relief regarding the applicability of deed restrictions to the Mahrous' tract of land in the Byrd Ranch Estates subdivision. The Mahrous counter-claimed seeking recognition of a recreational easement over Byrd's land. The district court rendered final judgment granting relief in favor of both parties. We will affirm the district court's judgment.

### Background

In 1973, Reba Byrd and her late husband L. Tonnet acquired a 1,502-acre cattle ranch near Johnson City (the "Ranch"). In 2000, Byrd began to develop the northern portion of the Ranch into the "Byrd Ranch Estates," filing the Byrd Ranch Estates Declaration of Covenants,

Conditions, and Restrictions (the "Declaration") in the Blanco County property records and completing a survey of the 22-tract subdivision.[1] She began marketing the Estates through real estate agents soon thereafter.

The northernmost portion of the Ranch—referred to as "Section 1" in surveys of the land, advertisements, and the deeds for the individual tracts located within the section—consists of approximately 440 acres and contains tracts 1 through 5 of the Byrd Ranch Estates. The central portion of the Ranch, similarly referred to as "Section 2," consists of approximately 498 acres and contains tracts 6 through 22 of the Byrd Ranch Estates. As established by the Declaration, Sections 1 and 2 are restricted "solely for single family residential use and no business or commercial structure shall be constructed or placed on the Property."[2]

Byrd retained ownership of the remaining portion of the Ranch, most often referred to as the "southern portion,"[3] which includes the entrance to the Ranch and access to Miller Creek and the Miller Creek Dam. Residents of the Estates must travel through the southern portion of the Ranch to reach the tracts in Sections 1 and 2. As such, the southern portion of the Ranch is burdened with an easement that gives a right of ingress and egress in favor of the Section 1 and 2 owners via a

---

[1] All of the properties at issue are located on the former Byrd Cattle Ranch in Blanco County near Johnson City. The geographic relationship of these and other relevant properties are depicted on our simplified version of the survey found in Appendix 1.

[2] The district court found that the Declaration applies to Sections 1 and 2. Neither party challenges this point on appeal.

[3] At trial, one witness referred to this southern portion of the Ranch as "Section 3." The Mahrous' brief to this Court also calls this area by that name. However, that moniker does not appear in any deed, title, survey, advertisement, or any other representation made by Byrd or her agents. Byrd refers to this area as "the southern portion," "the cattle ranch," "the frontage tract," or "the Byrd Ranch." The parties dispute this portion's status and the burdens over it in relation to the Byrd Ranch Estates properties located in Sections 1 and 2.

Grant and Declaration of Easement. In 2006, Byrd sold an 85-acre parcel from the southern portion of the Ranch to the Nagys, burdening that property with a residential restriction similar to that over Sections 1 and 2.[4] The remaining part of the southern portion of the Ranch still owned by Byrd is not subdivided and is currently available for sale.

In July 2007, after learning that the Declaration she had filed in 2000 applied only to Section 1, Byrd filed a "Notice of Addition of Land" in the Blanco County public records which purported to subject all of Section 2 to the Declaration's provisions. By this time, all tracts in Section 1 had been sold as well as 15 tracts in Section 2 (including appellees' tracts). Byrd sought to have the Section 2 owners ratify the addition and affirm the applicability of the Declaration to the lots in Section 2. In February 2011, Byrd's attorney sent a letter to the Section 2 owners, including appellees, stating that "owners who maintain the position that the Declarations do not apply to Section 2 are potential defendants in a suit to be brought under the Texas Declaratory Judgment[s] Act, if necessary." By 2010 and 2011, all Section 2 land owners—except for appellees Ali and Gypsie Mahrou, who own tracts 17 and 18—had executed separate ratifications of the Declaration. Byrd brought suit against the Mahrous for declaratory judgment seeking to establish the Declaration as applicable not only to Section 1, but also to Section 2. Byrd asserted a theory of implied negative reciprocal easement, arguing that Sections 1 and 2 were part of a common plan or scheme of development. Byrd also proffered a theory of extension via implicit ratification of the Declaration by Section 2 owners upon the creation of the Section 2 Property Owners Association in 2005.

---

[4] Although the Nagy property is burdened with a residential-use restriction similar to the one contained in the Declaration, Byrd maintains that the Declaration does not apply to any land in the "southern portion" of the Ranch. *See* shaded area on the map at Appendix 1.

In their answer and counterclaims, the Mahrous sought either to make the Declaration applicable to Section 1 exclusively or, alternatively, to make the Declaration applicable to all 1,502 acres of the original ranch (i.e., impose the Declaration on the subdivision as well as the land retained by Byrd). The Mahrous also sought the right of ingress, egress, and recreational use of Miller Creek and the Miller Creek Dam, which is located on the southern portion of the Ranch still owned by Byrd and which they had been using sporadically for recreational purposes since 2005, asserting that they had a recreational easement across the southern portion to the Miller Creek area by either implication or estoppel.

After a bench trial, the district court issued a final judgment that included the following relevant declarations:

1. It is ORDERED, ADJUDGED and DECLARED that the Implied Negative Reciprocal Easement doctrine applies to Tracts 17 and 18, located in Section 2 of the Byrd Ranch Estates, owned by Defendants Ali Mahrou and Gypsie Mahrou, and those tracts are bound by the Byrd Ranch Estate Declaration of Covenants, Conditions and Restrictions . . . .

2. It is also ORDERED, ADJUDGED and DECLARED that the Defendants Ali Mahrou and Gypsie Mahrou have Ratified the Declaration for the Byrd Ranch Estates thru their participation in the formation and operation of the Byrd Ranch Estates Homeowners Association; specifically, that Tracts 17 and 18, located in Section 2 of the Byrd Ranch Estates are bound by the Byrd Ranch Estate Declaration of Covenants, Conditions and Restrictions . . . .

. . . .

5. It is ORDERED, ADJUDGED and DECLARED the Defendant/Counter Plaintiffs, their guests and subsequent owners of Tracts 17 and 18, located in Section 2 of the Byrd Ranch Estates shall have the right of ingress, egress and recreational use of that land owned by Plaintiffs Reba Byrd, Individually or as Trustee of the Reba Byrd Trust generally located at the entrance to the Byrd Ranch Estates/Byrd Ranch at Miller Creek Cemetery Road and contiguous to and abutting Miller Creek and the Miller Creek Dam located at said entrance to the Byrd Ranch Estates. The Court furthers Orders a

4

permanent injunction shall issue prohibiting Plaintiffs Reba A. Byrd individually and as Trustee of the Reba Byrd Trust, or those acting under their direction or in concert with same, from interfering in any way with Defendants/Counter Plaintiffs, their guests and subsequent owners of Tracts 17 and 18, located in Section 2 of the Byrd Ranch Estates use and enjoyment of their right of ingress, egress and recreational use of this property.[5]

It is from this judgment and these specific declarations that both parties appeal.

## Byrd's Appeal

Byrd's single issue on appeal challenges the district court's grant of a recreational easement by estoppel to the Mahrous, arguing that the evidence is legally and factually insufficient to support the trial court's ruling. We disagree.

When a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue upon which she did not have the burden of proof—Byrd in this case—that party must demonstrate on appeal that there is no evidence to support the adverse finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id.* at 822. We must credit evidence favorable to the trial court's decision if a reasonable factfinder could and disregard all contrary evidence that a reasonable factfinder could ignore. *Id.* at 827. We will sustain a no-evidence complaint—the assertion Byrd makes here—when the record shows that (1) there is a complete absence of a vital fact, (2) the court is barred by law or the rules of evidence from considering the only evidence

---

[5] At trial the Mahrous asserted a recreational easement by either implication or estoppel. However, in their briefs to this Court, the parties confine themselves to discussing the theory of easement by estoppel. We will do likewise.

5

offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *See Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). More than a scintilla of evidence exists if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* We presume that the factfinder made all inferences in favor of the judgment, but only if reasonable minds could do so. *See id.*

When a party attacks the factual sufficiency of the evidence on an adverse finding on an issue upon which the other party had the burden of proof, the attacking party must show that the evidence is insufficient to support the finding. *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 201 (Tex. App.—Austin 2005, pet. denied). We must consider and weigh all the evidence, and we should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

Easement by estoppel requires proof of three elements: (1) a representation of the easement communicated, either by words or action, to the promisee; (2) the communication was believed; and (3) the promisee relied on the communication. *Storms v. Tuck*, 579 S.W.2d 447, 452 (Tex. 1979); *Vinson v. Brown*, 80 S.W.3d 221, 229 (Tex. App.—Austin 2002, no pet.). In other words, to create an easement by estoppel, something must be said or done by the owner of the servient estate at the time of the grant of the dominant estate that induces the acceptance of the grant (i.e., a purchaser buys land in reliance on a grantor's representations). *Lakeside Launches, Inc. v. Austin Yacht Club, Inc.*, 750 S.W.2d 868, 872 (Tex. App.—Austin 1988, writ denied). The essence of the doctrine of easement by estoppel is that the owner of a servient estate may be estopped from denying the existence of an easement by making representations that the owner of the dominant

estate then relies on. *See Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 209 (Tex. 1962). The doctrine is not clearly defined, and its application depends on the facts of each case. *See id.*

Byrd contends that the Mahrous do not have a recreational easement to access Miller Creek since neither she nor her agents made any explicit representations that such an easement existed. Byrd argues that there were no mentions of a recreational easement in any of the Byrd Ranch Estates listing agreements, in the property descriptions, or in the individual deeds of tracts within the Estates. Byrd further argues that no representations made directly to the Mahrous contained the phrase "recreational easement" or referenced possible use of a recreational area. Therefore, Byrd maintains, the promise of a recreational easement could not have induced the Mahrous to purchase property in the Estates.

The Mahrous urge, on the other hand, that representations of a recreational easement permitting access to the creek made in advertisements and emails induced them to buy property in Section 2. The Mahrous argue that the promise of access to Miller Creek served as an inducement to their purchase of land in the Estates. The Mahrous contend that—by including depictions of Miller Creek in ads for the Estates—Byrd created a positive inference that the creek was available to owners of the Estates. They point to evidence showing that Byrd licensed multiple realtors to market available properties at the Ranch—Wade Dahl and Jim Hollis—and that those realtors circulated advertisements and flyers depicting the available properties for sale. Alongside depictions of the Estates, the ads included pictures of the Miller Creek waterfront and the Miller Creek Dam.

The Mahrous contend that they relied on a September 19, 2005 email from Dahl in which he responds to their request for additional information about the properties available in the area. In the email, Dahl highlighted the presence of water on the property as an attractive and

7

desirable feature, stating, "There are several ponds on the ranch with a couple of running and wet weather creeks. There is abundant wildlife of all kinds. **This has to be one of the best live water ranches in Central Texas**." (Emphasis in original).

Considering this email in the light most favorable to the district court's finding, *see City of Keller*, 168 S.W.3d at 807 (reviewing no-evidence claims), a reasonable factfinder could read it to create the inference that water access would be open to purchasers of the tracts being marketed. Further, the email's emphasis on the availability of "live"—as opposed to stagnant—water on the ranch can be read to create such an expectation. While stagnant ponds are located all across the Ranch, Miller Creek is the only area on the Ranch with "live" running water.

The Mahrous also assert they saw internet advertising by Dahl referring to Miller Creek as a "wonderful recreation area." Byrd suggests that Mr. Mahrou's testimony about Dahl's internet advertisement was not credible because the ad was not submitted into evidence and cannot be located. However, the district court, as factfinder, is the sole judge of the credibility of a witness and the weight to give his testimony and, as the reviewing court, we must presume that the factfinder found his testimony to be credible. *Guerra*, 348 S.W.3d at 228; *City of Keller*, 168 S.W.3d at 817.[6] A reasonable factfinder could determine that the 2005 email and the internet ad were representations of a recreational easement made by Byrd or her agents. However, the easement-by-estoppel doctrine requires not only that such representations were made, but also

---

[6] The record here also includes a marketing flyer created by Hollis that captions a picture of Miller Creek as a "Wonderful Recreation Area." This flyer evidences the existence of an explicit representation of a recreation area by the owner made in marketing materials, thus supporting the district court's inferred finding that Mr. Mahrou's testimony regarding the internet ad with similar representations was credible, even though the Mahrous could not have relied on the Hollis flyer since they did not see it until trial.

8

that those representations were relied upon by the promisee, inducing the promisee to purchase the property. *See Storms*, 579 S.W.2d at 452; *see also Vinson*, 80 S.W.3d at 229. The Mahrous claim—in signed affidavits—that they were induced to purchase their lots in part due to their belief that an easement to access the creek was included in their purchase of land in Section 2:

> As part of an inducement to the purchase of Defendants['] Lots, I was provided marketing material which depicted a recreational area identified as a "Wonderful Recreational Area" (the "Recreational Area"). Plaintiff Byrd has made such Recreational Area available to all lot owners of Byrd Ranch Estates, yet Mrs. Byrd contends that such Recreational Area was never offered as a part of the Byrd Ranch Estates development, and they are free to sell the Recreational Area without encumbrance by the Declarations or any other license to the owners of Section 1 and 2 to use such Recreational Area in express violation of the representations of Plaintiff and Plaintiff's agents regarding access to and use of the recreational area benefitting Byrd Ranch Estates.

Mr. Mahrou also testified on direct examination that the Mahrous relied on these representations when purchasing Tracks 17 and 18:

> Q.  Can we agree that the whole basis for your claiming a recreational easement is because you thought the photographs sent by Mr. Dahl to you and your realtor applied to you?
>
> A.  Not only that. Until the summary judgment I was using it, my children were using it, and right after summary judgment this sign "No Fishing" went up.
>
> . . . .
>
> Q.  Okay. And you didn't rely on this wonderful recreational easement at the time you purchased Tract 17 and 18, did you?
>
> A.  Yes, I did because I was using that area.

These sworn statements, along with the advertising materials and communications, constitute at least some evidence in support of the district court's finding of a recreational easement by suggesting that

9

access to Miller Creek may have induced the Mahrous to purchase their tracts. Therefore, Byrd's legal-sufficiency challenge fails. *See City of Keller*, 168 S.W.3d at 814–17. Further, considering and weighing all the evidence, the evidence is not so weak that the district court's finding of a recreational easement is clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176 (holding that we may not reverse verdict for factual insufficiency unless the evidence that supports the finding "is so weak as to be clearly wrong and manifestly unjust"). Therefore, Byrd's factual-sufficiency challenge fails. The district court did not abuse its discretion in finding that the Mahrous have a recreational easement to access Miller Creek via Byrd's land.

We overrule Byrd's sole issue on appeal.


**Mahrous' Cross-Appeal**

In a single issue on cross-appeal, the Mahrous assert that the district court erred in refusing to hold that all 1,502 acres of the Ranch are burdened by the Declaration and restricted to residential use. Specifically, they maintain that the district court's implied finding that "Section 3" of the Ranch (a.k.a. the southern portion) was unrestricted is not supported by legally sufficient evidence but rather that the evidence conclusively shows—as a matter of law—that Byrd consistently represented to purchasers and another court that the "Byrd Ranch Estates" encompassed the entire ranch and described the Estates as a development restricted to residential use. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) ("When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."). We disagree.

In their pleadings to the district court, the Mahrous asserted that the southern portion of the Ranch should be restricted to residential use and burdened by the Declaration via application

10

of the implied-negative-reciprocal-easement doctrine. The implied-reciprocal-negative-easement doctrine is well-established in Texas. *Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990) (citing *Curlee v. Walker*, 244 S.W. 497, 498 (Tex. 1922)). In order to impose a restrictive covenant by implication on property retained by the original grantor—here, the southern portion—there must be evidence that (1) the grantor intended to adopt a scheme or plan of development that encompassed both the property conveyed and the property retained, and (2) the grantor subdivided the property into lots and included in the deeds of the properties conveyed substantially uniform restrictions designed to further the scheme or plan. *Evans*, 796 S.W.2d at 416. Under these circumstances, the burden the grantor has placed on the land conveyed is, by operation of law, reciprocally placed on the land he retained. *Saccomanno v. Farb*, 492 S.W.2d 709, 713 (Tex. Civ. App.—Waco 1973, writ ref'd n.r.e.) (citing 20 Am. Jur. 2d Covenants, *Conditions and Restrictions* § 733 (1965)).

The district court—the factfinder here—found that a common plan exists as to Sections 1 and 2, but implicitly found that the plan excludes the southern portion. As such, the restrictions on Section 1 are applicable to Section 2 via application of implied-negative-reciprocal-easement doctrine but, because the southern portion is not part of the common plan, it is not burdened by the common plan's restrictions. As noted, the Mahrous challenge this finding on appeal and argue that the evidence is legally insufficient to support the trial court's ruling. The Mahrous insist that the evidence conclusively establishes that Byrd consistently represented to purchasers and another court that the "Byrd Ranch Estates" included the entire Ranch and described the Estates as a development restricted to residential use.

To succeed in their legal-sufficiency challenge, the Mahrous must establish that the implied-negative-reciprocal-easement doctrine applies the restrictions of Sections 1 and 2 to the

11

southern portion of the Ranch as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241. To do that, the evidence in the record must conclusively establish that all three areas of the Ranch were part of the same common plan of development. *See id.*; *see also Ski Masters of Texas, LLC v. Heinemeyer*, 269 S.W.3d 662, 670 (Tex. App.—San Antonio 2008, no pet.) (existence of general plan or scheme is fact issue); *Hooper v. Lottman*, 171 S.W. 270, 272 (Tex. Civ. App.—El Paso 1914, no writ) (existence and scope of common plan or scheme of development and its scope is fact question); Restatement (Third) of Property: Servitudes § 2.14 cmt. f (2000) ("Existence of a general plan is a question of fact to be determined from the circumstances.").

A general scheme or plan does not necessarily apply to all the land owned or subdivided by a common grantor. *See Evans*, 796 S.W.2d at 471. "[T]he general plan or scheme may be that the restrictions only apply to certain well-defined similarly situated lots for the doctrine of implied reciprocal negative easements to apply as to such lots." *Id.* In other words, a grantor can set aside unrestricted land so long as the unrestricted area is well-defined and similarly situated.

Here, the parties agree that Section 1 and Section 2 are part of a common plan and that the lots retained by Byrd within the Estates are burdened by the Declaration and a restriction to residential use. The evidence in the record supports an inference that the common plan was limited to Sections 1 and 2 because the lots were marketed together, similarly situated in the northern two-thirds of the Ranch, and defined by their subdivision into tracts and lots described in metes and bounds.

By contrast, the evidence shows that the southern portion is not divided into distinct tracts. *See Evans*, 796 S.W.2d at 467. The southern portion is distinct from Sections 1 and 2 in that it was not sold or marketed as part of the Byrd Ranch Estates. For example, the flyers and

12

advertisements for the Estates distributed by Dahl market only Sections 1 and 2 as separate phases of the Byrd Ranch Estates development. Flyers for the Estates do not include information on the available land in the southern portion. While advertisements for the Estates do include pictures of Miller Creek and the Miller Creek Dam, a reasonable viewer could not definitively identify the pictured land as part of the southern portion considering the pictures are not captioned and contain no geographic markers. Rather, the inclusion of these images in marketing materials for the Estates can, at most, only be considered to support the inference that the waterfront might be available for use by owners of the Estates. As such, these ads do not establish as a matter of law that the southern portion was part of, or even marketed as, the Estates. *See Dow Chem. Co.*, 46 S.W.3d at 241.

Moreover, marketing for the southern portion is controlled by a separate listing agreement from those controlling Sections 1 and 2. The southern portion's listing agreement refers to the property as the "L.T. Byrd Ranch," not the Byrd Ranch Estates. The record contains one example of marketing for the southern portion, the 2005 Dahl email addressed above. The 2005 email identifies three parcels of available land on the Ranch:

A.  365 acres mostly cleared of cedar, good variety of trees and grasses. Approximately 3/4 mile of dammed up Miller Creek, both sides of the creek, concrete dam approx. 15 ft. deep. The creek is good water, big enough for a party boat (included with concrete and wooden dock). Approx. 60 acre terraced hay field, several barns and cattle pens. Priced at $12,000 per acre or $4,380,000.

B.  135 acres mostly cleared of cedar, with approx. 3200 sq.ft. main house, and another separate 1600 sq.ft. in guest quarters. Main house is 212 with commercial kitchen, dining room with marble tables for 24, pool, hot tub, outside dance floor and entertaining area, manicured villa-like grounds. 360° views from this hilltop home for miles. Priced at $1,700,000.

C.  Another 496 acres platted Into 15 tracts of 25 to 65 acres. Great building sites, several ponds, views for miles, mostly cleared of cedar, good

restrictions, and abundant wildlife of all kinds. Ag exempt. Owner offering good terms on the tracts. Individually priced at $7,000 to $8,900 per acre.

Although the land in Section 2 is advertised alongside land in the southern portion, the email can be reasonably read to merely list all the available properties on the Ranch that Dahl was licensed to sell at the time.

The Mahrous also rely in part on the fact that segments of the southern portion have been sold with residential-use restrictions similar to those over the Byrd Ranch Estates. However, without more, this fact is legally insufficient to support the finding that Byrd intended to create a common plan of development with all three areas. *See Harbor Ventures, Inc. v. Dalton*, No. 03-10-00690-CV, 2012 WL 1810205, at *5 (Tex. App.—Austin May 18, 2012, pet. denied) (mem. op.) (tracts conveyed with similar restrictions on commercial use are no evidence of the original grantor's intent to create a common scheme or plan that included all the property she owned). The fact that the original grantor inserts substantially similar restrictions in deeds of property conveyed, standing alone, is no evidence of a scheme or plan of development that could justify imposing a similar implied restriction on property the grantor retained. *See Saccomanno*, 492 S.W.2d at 713 ("[T]he fact that in the deed of conveyance a grantor imposes restrictions on a part of a tract which he sells and declares that the restrictions are to run with the land does not, by itself, raise any legal or factual presumption that he means thereby to so restrict the retained portion of the tract."); *Cambridge Shores Homeowners Ass'n v. Spring Valley Lodge Co.*, 422 S.W.2d 10, 13 (Tex. Civ. App.—Dallas 1967, no writ) (the mere fact that deeds contain identical restrictions is not alone sufficient to establish the existence of general scheme); *see also* 20 Am. Jur. 2d Covenants, *Conditions, and Restrictions* § 168 (1965) (mere fact that grantor imposes restrictions

14

on part of tract of land he is selling does not necessarily lead to conclusion that he intended thereby to have restrictions apply to his remaining land).

Our legal-sufficiency standard of review requires us to consider the evidence in the light most favorable to the challenged finding and to indulge every reasonable inference that would support it. *See City of Keller*, 168 S.W.3d at 802. The evidence in the record is legally sufficient to support the district court's finding that the residential-use restrictions and the burdens of the Declaration apply only to Sections 1 and 2, and not to the southern portion of the Ranch. As such, the district court did not abuse its discretion.

We overrule the Mahrous' cross-issue.

## Conclusion

Having overruled the parties' issues on appeal, we affirm the judgment of the trial court.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Bourland

Affirmed

Filed:  July 22, 2016

15

