# Supreme Court of Texas

No. 22-0733

River Plantation Community Improvement Association,

*Petitioner*,

v.

River Plantation Properties, LLC and
Preisler Golf Properties, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Ninth District of Texas

**Argued March 20, 2024**

JUSTICE LEHRMANN delivered the opinion of the Court.

The issue in this case is whether real property in the River Plantation subdivision, which has been operated as a golf course since the subdivision's establishment, is burdened by an implied reciprocal negative easement that precludes the property from being used for any other purpose in perpetuity. The trial court granted summary judgment for the golf course property's owners, holding it is not burdened by an implied reciprocal negative easement as a matter of law. The court of

appeals affirmed. We agree and affirm the court of appeals' judgment. We are not asked to recognize or apply a broader and distinct estoppel-based theory of implied servitudes, and we decline to do so.

## I. Background

In 1963, River Plantation Development Company, Inc. (RP Development) owned a large tract of land that would become the River Plantation subdivision, which was platted in multiple sections over several years. RP Development recorded the Section One plat (and replat), which showed lots and streets along with areas labeled "Reserves." RP Development also recorded restrictive covenants for the section in 1964 stating that RP Development, "desiring to create and carry out a uniform plan for the improvement, development and sale of all the numbered lots (excluding the Reserves shown)" in the section "for the benefit of the present and future owners of said property, does hereby adopt and establish the following reservations, restrictions, covenants and easements to apply uniformly in the use, occupancy and conveyance of all such numbered lots . . . ." Among many other restrictions, the covenants included setback and minimum-size requirements and a residential-use restriction.

In 1966, RP Development conveyed the land in the subdivision, minus the lots that had already been sold, to Walter M. Mischer Co. The deed to Mischer contained no restrictions beyond those already of record. Over the next few years, Mischer recorded plats for Sections Two, Three, Four, Four-A, and Five,[1] portions of which abut the area that would

---

[1] There are more sections in the subdivision, but they are not at issue.

become a golf course. Like the Section One plat, the Section Four plat shows areas labeled "Reserves," and the plats for Sections Two and Five graphically depict golf holes and outlines of fairways in the "Reserves" areas.

Mischer recorded restrictive covenants for Sections Two, Three, Four, Four-A, and Five between 1967 and 1972. The covenants for four of these five sections contain introductory language identical to that in the Section One covenants regarding the owner's "desir[e] to create and carry out a uniform plan for the improvement, development and sale of all the numbered lots (excluding the Reserves shown)." The Section Four-A covenants contain the same language but without the parenthetical "excluding the Reserves shown." And all the covenants contain similar restrictions regarding, for example, residential use and minimum home size. They also designate the lots abutting the Reserves—255 total, including all the lots in Section Four-A—as "Golf Course lots" that have additional specific restrictions, such as requirements that structures be set back at least twenty-five feet from lot lines abutting the golf course, that garages not face the golf course, and that telephone lines be laid underground. The covenants for each section state that they are enforceable by the owners of the lots in that section as well as the River Plantation Community Improvement Association (the Association), the plaintiff in this case. The covenants run with the land for fifty years and are automatically extended for successive ten-year periods unless a majority of owners agrees to amend or cancel them.

3

When River Plantation was being developed in the late 1960s and early 1970s, marketing materials for the subdivision portrayed it as a golf course community. Advertisements in the Conroe newspaper replaced the "i" in "River" and in "Plantation" with an image of a golf ball on a tee, and one included a map with references to a golf course and clubhouse. Advertisements in the Conroe High School yearbook in 1969 and 1971 used the golf-ball-and-tee logo, contained pictures of people golfing, and referenced golf fairways. In the early 1970s, River Plantation sales brochures and real estate agents described it as a golf course and country club community. George Gordon, who purchased a home in River Plantation in 1973 and still lives there, attested that his realtor, whose sales office "was somewhere on site in River Plantation," provided brochures and information "advertis[ing] the River Plantation golf course with twenty-seven holes of golf" and advised "that the River Plantation subdivision was a golf course and country club community." At that time, purchasing a home in the subdivision came with membership in the golf course and country club, though payment of dues was required to maintain membership. Gordon further averred that the realtor represented that "River Plantation was then and was going to remain a golf course community or subdivision" and that he would not have purchased property in the subdivision absent those representations.

Ultimately, hundreds of homes were constructed in the subdivision, along with a twenty-seven-hole golf course (comprising the "Charleston nine-holes," the "Augusta nine-holes," and the "Biloxi

4

nine-holes"), a clubhouse, and other amenities. According to the Association's petition, the golf course opened in the 1968–69 timeframe.

In 1973, Mischer conveyed the River Plantation property it still owned, including the golf course property, back to RP Development with no restrictions other than those already of record. In 1977 and 1981, RP Development executed deeds conveying the golf course property to Plantation Management Company. The 1977 deed contained an express restriction requiring the grantee to use the property as a golf course and country club for ten years, with title to revert automatically to the grantor if such use ceased. At the expiration of that ten-year period, the property was restricted for another ten years to use for "recreational or residential purposes, or both, only." The 1981 deed required the grantee to use the property "for recreational or residential purposes, or both" for a period of twenty years.[2] After a series of conveyances, River Plantation Properties, LLC (RP Properties) purchased the golf course property in 2008.

In 2017, the Association learned that RP Properties planned to sell the property and that the buyer intended to remove the golf course and build homes. The Association sued, seeking a declaratory judgment that the golf course property is encumbered by an implied reciprocal

---

[2] To obtain certain tax advantages, Plantation Management recorded two "Declaration[s] of Restrictions" regarding the golf course property, one in 1977 and one in 1983. Plantation Management declared therein that the property "shall be limited to recreational uses to include, but not be limited to the operation of golf and tennis facilities and ancillary uses related thereto" for a period of eleven years from the date of recording. Those declarations would have expired by their terms in 1988 and 1994, respectively.

negative easement restricting it to use solely as a golf course. RP Properties counterclaimed for the opposite relief, requesting a declaration that the property is *not* so encumbered.[3] While the suit was pending, RP Properties sold a portion of the golf course property—the Augusta and Biloxi courses as well as the clubhouse—to Preisler Golf Properties, LLC, and the Association amended its petition to add Preisler as a defendant.[4]

RP Properties and Preisler moved for partial summary judgment, and the trial court granted both motions, declaring that the golf course property "is free of any use restriction or encumbrance by way of an implied reciprocal negative easement that limits the use of the said property as a golf course, country club, recreational area, or in any other manner." The trial court then rendered a final judgment in which it found that no party should be awarded attorney's fees.

The court of appeals affirmed, holding that no implied reciprocal negative easement burdens the golf course property. 661 S.W.3d 812

---

[3] RP Properties also counterclaimed for tortious interference with its contract to sell the property, and the would-be buyer sued the Association for tortious interference in a separate action. After the cases were consolidated, the Association filed a motion to dismiss the tortious-interference claims under the Texas Citizens Participation Act. The trial court denied the motion, but the court of appeals reversed and remanded to the trial court to dismiss the claims, which were severed and are not at issue here. *River Plantation Cmty. Improvement Ass'n v. River Plantation Props., LLC*, No. 09-17-00451-CV, 2018 WL 4120252, at *7 (Tex. App.—Beaumont Aug. 30, 2018, no pet.).

[4] The Charleston course property was the subject of a condemnation action, and ownership of that property has been vested in the River Plantation Municipal Utility District pursuant to an agreed judgment. RP Properties remains a party to this suit because it purportedly maintains a contingent interest in the property it sold to Preisler.

6

(Tex. App.—Beaumont 2022). The court noted that when RP Development and Mischer developed the subdivision, they retained the Reserves without placing any restrictions on their use, and the recitals in the property records put prospective lot owners on notice that the Reserves were excluded from the subdivision's uniform plan. *Id.* at 822. As to the advertisements, the court of appeals held that they "do nothing more than inform potential buyers about the advantages of living in the subdivision on dates contemporaneous with those the ads were placed." *Id.* at 823. Finally, the court held that Gordon's affidavit failed to create a fact issue because it did not reveal whether the realtor who allegedly told him the subdivision would remain a golf course community worked for or was an agent of Mischer. *Id.*

We granted the Association's petition for review. "We review summary judgments de novo, viewing the evidence in the light most favorable to the non-movant, crediting evidence favorable to the non-movant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019).

## II. Discussion

A restrictive covenant "limit[s] the use an owner or occupier of land can make of their property." *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 279 (Tex. 2018) (citing RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.3(3) cmt. e (AM. L. INST. 2000)). While "our jurisprudence does not favor restraints on the free use of land," *id.*, we also recognize that parties have the right "to contract with relation to property as they see fit, provided they do not contravene public policy

7

and their contracts are not otherwise illegal." *Id.* (quoting *Curlee v. Walker*, 244 S.W. 497, 498 (Tex. 1922)). In that respect, a restrictive covenant is simply a contractual agreement between a seller and a purchaser of real property and is enforced accordingly. *Id.* A restrictive covenant that runs with the land falls under the more general term "servitude."[5]

Restrictive covenants are commonly used in both residential and commercial developments to maintain the character of the neighborhood in accordance with the development plan and to enhance property values. *Davis v. Huey*, 620 S.W.2d 561, 565 (Tex. 1981). For example, a developer may burden lots with restrictions on use (e.g., residential only), minimum square-footage requirements, and minimum setback requirements. "The buyer submits to a burden upon his own land because of the fact that a like burden imposed on his neighbor's lot will be beneficial to both lots." *Tarr*, 556 S.W.3d at 280 (citation omitted).

In the absence of an express restriction on a particular lot, one may be created by implication in narrow circumstances. We have recognized that the doctrine of "implied reciprocal negative easements"—or what the Restatement calls, perhaps more accurately, implied reciprocal servitudes—can apply "when an owner of real property subdivides it into lots and sells a substantial number of those lots with [express] restrictive covenants designed to further the owner's

---

[5] The Restatement defines a servitude as "a legal device that creates a right [benefit] or an obligation [burden] that runs with land or an interest in land." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1(1) (AM. L. INST. 2000).

general plan or scheme of development." *Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990). In that circumstance, the lots retained by the owner, and those sold without the express restrictions to a grantee "with notice of the restrictions in the other deeds," are subject to the same covenants burdening the lots sold with the express restrictions. *Id.* In *Evans*, we approved of the following "reasonably accurate general statement of the doctrine":

> [W]here a common grantor develops a tract of land for sale in lots and pursues a course of conduct which indicates that he intends to inaugurate a general scheme or plan of development for the benefit of himself and the purchasers of the various lots, and by numerous conveyances inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication an equitable right . . . to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants.

*Id.* (citation omitted); *see also Baywood Ests. Prop. Owners Ass'n v. Caolo*, 392 S.W.3d 776, 783 (Tex. App.—Tyler 2012, no pet.) ("If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit.").

The Supreme Court of Nebraska recently provided a helpful discussion of the doctrine's historical context. *See Walters v. Colford*, 900 N.W.2d 183 (Neb. 2017). "Because developers historically restricted properties as part of their plan of development on a deed-by-deed basis," the court explained, "the doctrine was created to fill the gap where a property was conveyed without restrictions in the deed . . . in order to

9

protect the other property owners' reasonable expectations that all of the lots within the plan of development will be similarly restricted." *Id.* at 193. By contrast, the common practice today is to record a declaration of restrictions applicable to the entire development. *Id.* "Where this occurs, there is no need for the doctrine's gap-filling function." *Id.*

The implied reciprocal negative easement doctrine plainly does not apply here. The Association's complaint is not that a substantial number of lots in the River Plantation subdivision were burdened by express restrictions when originally conveyed by the developer while others were not. Indeed, all the lots in each subdivision section at issue are burdened by the express restrictive covenants contained in the recorded declaration applicable to the entire section—e.g., residential use only and minimum dwelling size. Thus, there is no gap to fill. The golf course property clearly was not intended to be burdened by similar restrictions, nor does the Association contend that it was. Instead, the Association argues that the property should be burdened by an entirely *different* restriction: golf course use only.

The Association focuses heavily on our statement in *Evans* that "[t]he central issue" in a dispute about the existence of an implied reciprocal negative easement "is usually the existence of a general plan of development." 796 S.W.2d at 466. In turn, the Association contends that the plat maps, advertising representations, and express restrictive covenants at least create a fact issue on the existence of Mischer's general plan to develop a golf course subdivision. But a general development plan is not the only element of an implied reciprocal negative easement claim. Again, the doctrine was created as a narrow

10

exception to the general rule that an express restriction is required to limit a property owner's permissible uses of its property. It applies when (1) a substantial number of lots in a subdivision (or a particular portion of a subdivision) are sold with substantively uniform express restrictions pursuant to a development scheme or plan and (2) some lots are either retained by the developer or are sold without those express restrictions to a purchaser with notice of the existing restrictions on other lots consistent with the general development plan. *Id.* In that instance, the *express* restrictions on the former lots give rise to similar *implied* restrictions on the unburdened lots. *Id.*; *see also Bethea v. Lockhart*, 127 S.W.2d 1029, 1032 (Tex. App.—San Antonio 1939, writ ref'd) (holding, in a case tried on an implied reciprocal negative easement theory, that the trial court did not err in submitting a jury instruction requiring that the restrictions be "substantially uniform, and that they be imposed on substantially all the lots in the restricted area").[6] Here, there are no substantially uniform express restrictions

_____

[6] *See also Ski Masters of Tex., LLC v. Heinemeyer*, 269 S.W.3d 662, 673–74 (Tex. App.—San Antonio 2008, no pet.) (holding that where tract was subdivided into ten lots and eight of the ten deeds contained residential-use restrictions, the other two lots were similarly burdened); *H.H. Holloway Tr. v. Outpost Ests. Civic Club, Inc.*, 135 S.W.3d 751, 756–57 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding that two of the lots in a subdivision were subject to the residential-use restrictions expressly burdening the remaining lots even though the deed conveying the former lots did not expressly state such a restriction); *Lehmann v. Wallace*, 510 S.W.2d 675, 682 (Tex. App.—San Antonio 1974, writ ref'd n.r.e.) (holding that deed restrictions prohibiting re-subdivision of tracts and construction of more than one primary residence on each tract burdened lots retained by the developer).

on the River Plantation lots that the Association claims give rise to similar restrictions on the golf course property.

For the same reason, the Association's insistence that "[r]eciprocity is not a factual element required to prove the existence of an [implied reciprocal negative easement]" and its reliance on the express restrictions on the lots adjacent to the golf course—such as the twenty-five-foot setback requirement and the requirement that telephone lines be laid underground—are misplaced. The Association cites case law from other jurisdictions concluding that similar restrictions on lots adjacent to subdivision property developed as a golf course contributed to the creation of an implied servitude prohibiting that property from being used for any other purpose. *See, e.g.*, *Mountain High Homeowners Ass'n v. J.L. Ward Co.*, 209 P.3d 347, 355 (Or. Ct. App. 2009); *Shalimar Ass'n v. D.O.C. Enters., Ltd.*, 688 P.2d 682, 691 (Ariz. Ct. App. 1984). Those cases, however, relied on a much broader servitude-by-estoppel theory that is distinct from an implied reciprocal negative easement. *Mountain High*, 209 P.3d at 355 (citing RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.10 (AM. L. INST. 1998) (enumerating the following elements of an implied "equitable servitude by estoppel": (1) either an express or implied representation is made; (2) under circumstances where it is reasonably foreseeable that the person to whom the representation is made will rely on it; (3) the person does so rely; (4) such reliance is reasonable; and (5) the establishment of a servitude is necessary to avoid injustice)). We have never gleaned an implied restriction on property use by virtue of entirely different express restrictions placed on neighboring property.

12

We are not asked to adopt Section 2.10 of the Restatement as Texas law, nor do we address whether such a theory would necessarily entitle the Association to relief here. As noted, the Association sought only a declaration that the golf course property is burdened by an implied reciprocal negative easement under *Evans*. Further, the trial court's judgment for RP Properties and Preisler declared only that the golf course property "is free of any use restriction or encumbrance by way of an implied reciprocal negative easement that limits the use of the said property as a golf course, country club, recreational area, or in any other manner." Applying *Evans*, we hold that the trial court's judgment was correct.

## III. Conclusion

The trial court correctly rendered summary judgment declaring that the golf course property is not burdened by an implied reciprocal negative easement. We therefore affirm the court of appeals' judgment.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 14, 2024

13